LAWRENCE WASDEN
ATTORNEY GENERAL

BRIAN KANE, ISB #6264
Assistant Chief Deputy Attorney General

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation

MICHAEL S. GILMORE, ISB #1625
KARIN D. JONES, ISB #6846
Deputy Attorneys General
954 W. Jefferson St., 2nd Floor
P.O. Box 83720
Boise, ID  83720-0010
Telephone:  (208) 334-2400
Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONALD N. DAIEN, | ) |
| Plaintiff, | ) Case No. 09-022-S-REB |
| | ) |
| vs. | ) **MEMORANDUM IN SUPPORT OF** |
| | ) **DEFENDANT'S MOTION FOR** |
| BEN YSURSA, in his official capacity as | ) **SUMMARY JUDGMENT** |
| Secretary of State of the State of Idaho, | ) |
| | ) |
| Defendant. | ) |

Secretary of State Ben Ysursa, by and through his counsel of record, hereby files his Memorandum in Support of Defendant's Motion for Summary Judgment.  Plaintiff Donald Daien challenges the constitutionality of Idaho Code § 34-708A and § 34-1807, claiming that these election statutes violate his rights to free speech, free association, and equal protection of the laws under the First and Fourteenth Amendments of the United States Constitution.  There are no genuine issues of material fact regarding Plaintiff's claims; therefore, Defendant respectfully requests that this Court grant his Motion for Summary Judgment and dismiss Plaintiff's claims on the following bases:

- This matter is not justiciable; Plaintiff has no standing, and his claims are not ripe.

- Idaho Code § 34-1807's requirement that petitions must be circulated by residents of Idaho is reasonable and/or narrowly tailored to serve compelling State interests of regulation of petitions and prevention of election fraud, particularly when viewed as one part of the entire statutory scheme for access to Idaho's general election ballot.

- Idaho Code § 34-708A's signature requirement of 1% of the electorate advances the State's important regulatory interest in avoiding lengthy, costly, and confusing ballots that include candidates who have not demonstrated a requisite modicum of support, while still providing meaningful access to the ballot for independent presidential candidates.

## BACKGROUND

Under Idaho's election statutes, to qualify for the Idaho ballot as an Independent candidate for President of the United States ("President"), an individual must submit a declaration of candidacy and "a petition signed by a number of qualified electors not less than one percent (1%) of the number of votes cast in this state for presidential electors at the previous general election at which a president of the United States was elected."   Idaho Code § 34-708A (2008).   For 2012, the required number of signatures is 6,550 (1% of the 655,032 ballots cast for presidential electors in 2008).   Affidavit of Defendant, the Hon. Ben Ysursa, Secretary of State of the State of Idaho ("Ysursa Aff."), ¶ 3; Idaho Code § 34-708A.   An Independent candidate has until August 25th before the general election to file a declaration of candidacy and accompanying petitions. Idaho Code § 34-708A.

The petitions accompanying an Independent candidate's declaration of candidacy must comply with Idaho Code § 34-1807, which provides that "[a]ny person who circulates any petition for an initiative or referendum shall be a resident of the state of Idaho … ."   Idaho Code § 34-1807 (2008); Idaho Code § 34-708A.   Idaho's election statutes do not prohibit a non-

resident from:  (1) accompanying an Idaho resident who is circulating petitions in support of a proposed Independent candidate for President;  (2) speaking to a qualified Idaho elector in support of a proposed Independent candidate for President; or (3) recruiting an Idaho resident to circulate petitions in support of a proposed Independent candidate for President.  <u>See</u> Statement of Material Facts that Defendant Contends Are Not in Dispute ("Statement of Facts"), ¶¶ 10-11; Affidavit of Counsel Michael Gilmore ("Gilmore Aff."), Ex. F, p. 6.

Even if an Independent candidate for President does not obtain enough signatures to appear on the general election ballot, the candidate may run as a write-in, and his or her votes will be counted if he or she files a declaration of intent to be a write-in candidate with the Office of the Secretary of State at least fourteen days before the general election.  Idaho Code § 34-702A; Ysursa Aff., ¶ 4.  Several candidates, including Ralph Nader, have obtained access to the Idaho ballot as Independent candidates for the presidential election in compliance with these statutory requirements.  Statement of Facts, ¶¶ 14-19.

Plaintiff is a resident of Arizona who states that he wishes to circulate petitions in Idaho on behalf of a potential Independent candidate for President, "specifically Ralph Nader or other similarly-minded persons."  Complaint, ¶¶ 4-5, 10; Statement of Facts, ¶¶ 1-2.  He challenges the constitutionality of:  (1) Idaho Code § 34-708A's requirement that an Independent candidate for President submit a petition accompanied by 6,550 signatures of qualified electors for the 2012 election; and (2) § 34-1807's requirement that petitions circulated on behalf of a proposed Independent candidate for President must be circulated by Idaho residents.

## STANDARD FOR ISSUANCE OF SUMMARY JUDGMENT

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

and the movant is entitled to judgment as a matter of law."  F.R.C.P. 56(c).  "To withstand summary judgment, [Plaintiff] must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial."  <u>Galen v. County of Los Angeles</u>, 477 F.3d 652, 658 (9th Cir. 2007).

## ARGUMENT

Plaintiff's claims are not justiciable because Plaintiff does not have standing and his claims are not ripe for review.  Even if Plaintiff's claims were justiciable, the challenged statutes are not unconstitutional under the First and Fourteenth Amendments.

**A.  Plaintiff's Claims Are Not Justiciable**

1.  <u>Plaintiff Lacks Article III Standing</u>

Plaintiff lacks standing to bring claims that really belong to Independent candidates for President.  "Our role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution."  <u>Thomas v. Anchorage Equal Rights Comm'n</u>, 220 F.3d 1134, 1138 (9th Cir. 2000).  Article III standing "is a controlling element in the definition of a case or controversy" that requires, "[a]t an irreducible constitutional minimum:"

> [A] plaintiff must show (1) ***[he] has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical***; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

<u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 180-81 (2000) (emphasis added) (internal quotation marks and citation omitted).

Plaintiff cannot demonstrate that he "has suffered an injury in fact that is … concrete and particularized and … actual and imminent," <u>see</u> <u>id.</u>, because neither he nor anyone else knows

whether any Independent candidates for President will attempt to qualify for the 2012 Idaho ballot.   Instead, Plaintiff has raised only a conjectural, hypothetical claim.

Plaintiff states that he is a non-resident who "wishes to circulate ballot nomination petitions in the state of Idaho on behalf of an independent presidential candidate, specifically Ralph Nader or other similarly-minded persons."   Complaint, ¶ 5.   Plaintiff points out that it would be illegal for him to do so, under Idaho Code § 34-1807.   Id. at ¶¶ 3-4.   However, Plaintiff has no personal knowledge of Mr. Nader's intentions regarding the 2012 election and cannot cite any facts stating that Mr. Nader will attempt to qualify for the ballot as an Independent candidate and not as a candidate of a political party.   Statement of Facts, ¶ 8.   In fact, as of August 4, 2009, Plaintiff was not aware of any person who had declared with the Federal Election Commission to run as an Independent candidate for President in 2012.   Id. at ¶ 7.   As of the date of this filing, no one has asked the Idaho Secretary of State to provide forms for declaration of candidacy as an Independent candidate for President in 2012, and no person has filed a declaration of candidacy with the Idaho Secretary of State as an Independent candidate for 2012.   Id. at ¶ 9.   In sum, Plaintiff is speculating whether Mr. Nader – or any Independent candidate, for that matter – will run for President in Idaho in 2012.   Plaintiff is basing his claims on a purely hypothetical candidacy and on his vague, generalized interest in circulating petitions for a hypothetical candidate.   This is exactly the type of "conjectural or hypothetical" claim and "generalized grievance" excluded from the courts' jurisdiction.   Alaska Right to Life Political Action Comm. v. Feldman, 504 F.3d 840, 848-49 (9th Cir. 2007).

Plaintiff's claims regarding § 34-708A's 1% signature requirement for Independent candidates for President are even farther removed from his interests.   Plaintiff has pointed to no injury – whether actual or hypothetical – on **his** part stemming from this requirement.   Plaintiff

does not claim that he intends to run as an Independent candidate for President and does not explain how his legal interests are otherwise directly affected by the 1% signature requirement for Independent candidates.  See Complaint.  Plaintiff is not even a qualified Idaho elector who could vote for any candidates on the Idaho ballot.  Id. at ¶ 4.  Instead, Plaintiff asserts a "generalized grievance" regarding the signature requirement, on behalf of third parties – the actual candidates – rather than on behalf of himself.  Feldman, 504 F.3d at 848-49.

In sum, taking into account the constitutional requirements of Article III standing, Plaintiff's claims fail to state a concrete, particularized injury and live case or controversy that would support this Court's jurisdiction.

2.      Plaintiff's Claims Are Not Ripe for Review

In addition, Plaintiff's claims are not ripe.  "[R]ipeness is peculiarly a question of timing, designed to prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements."  Thomas, 220 F.3d at 1138 (internal quotation marks and citations omitted).  Ripeness mirrors the issue of standing because it involves "measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical … ."  Id. at 1139 (internal quotation marks and citation omitted).  "In assuring that this jurisdictional prerequisite is satisfied, we consider **whether the plaintiffs face a 'realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement, or whether the alleged injury is too 'imaginary' or 'speculative' to support jurisdiction**."  Id. (emphasis added), *quoting* Babbit v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979).

With respect to Plaintiff's challenge to the constitutionality of Section 34-1807's residency requirement for circulating petitions, the mere existence of a statute and generalized

threat of prosecution do not create a sufficient direct injury or an actual case or controversy. Thomas, 220 F.3d at 1139.  Instead, Plaintiff must demonstrate that he is subject to a "genuine threat of imminent prosecution."  Id., *quoting* San Diego County Gun Rights Comm'n v. Reno, 98 F.3d 1121, 1126 (9th Cir. 1996).  "In evaluating the genuineness of a claimed threat of prosecution, [the courts] look to whether the plaintiffs [1] have articulated a concrete plan to violate the law in question, [2] whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and [3] the history of past prosecution or enforcement under the challenged statute."  Thomas, 220 F.3d at 1139.  Plaintiff fails to meet the first prong.

Plaintiff has not "articulated a concrete plan to violate the law in question."  Id.  As discussed above, Plaintiff has merely expressed his vague desire "to circulate ballot nomination petitions in the state of Idaho on behalf of an independent presidential candidate, specifically Ralph Nader or other similarly-minded persons."  Complaint, ¶ 5.  "The Constitution requires something more than a hypothetical intent to violate the law.  …  A general intent to violate a statute at some unknown date in the future does not rise to the level of an articulated, concrete plan."  Thomas, 220 F.3d at 1139.  "[S]uch some-day intentions – without … specification of when the some day will be – do not support a finding of the 'actual or imminent injury' that our cases require."  Reno, 98 F.3d at 1127.  Plaintiff's general, hypothetical intent to violate § 34-1807 **if** Ralph Nader or other, unidentified, "similarly-minded persons" decide to run for President as Independents in 2012 or later "does not rise to the level of an articulated, concrete plan" to violate the statute, particularly when Plaintiff cites no evidence that either Mr. Nader or any other Independent candidate is even planning to run for President in Idaho in 2012.  Thomas, 220 F.3d at 1139; Complaint, ¶ 5; Statement of Facts, ¶¶ 7-9.

/ / /

Plaintiff also challenges the constitutionality of Idaho Code § 34-708A's 1% signature requirement for Independent candidates for President, but he cannot show that he faces a 'realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement;" rather, "the alleged injury is too 'imaginary' or 'speculative' to support jurisdiction." Thomas, 220 F.3d at 1139, *quoting* Babbit, 442 U.S. at 298. As discussed previously, Plaintiff does not claim to be a potential Independent candidate for President or to be otherwise directly affected by the requirement that an Independent candidate must obtain the requisite number of signatures of Idaho electors. See Complaint. Instead, Plaintiff vaguely hints that the 1% signature requirement might prevent an unidentified, hypothetical Independent candidate – hypothetically supported by Plaintiff – from qualifying for the Idaho ballot in 2012. Notably, Idaho's recent election history demonstrates that several Independent candidates for President, including Ralph Nader, have qualified for the Idaho ballot. Statement of Facts, ¶¶ 14-19. There is no evidence that the 1% signature requirement presents an actual, direct injury to an actual Independent candidate, let alone to a non-candidate such as Plaintiff. This is particularly true given that Plaintiff is not even a qualified elector in Idaho, further diminishing any claim he may have that he would be directly injured by a candidate's hypothetical inability to meet the signature requirement and thus attain a place on the Idaho ballot. Complaint, ¶ 4.

Plaintiff's claims are not ripe for review and therefore must be dismissed as a matter of law.

**B.      Idaho Code § 34-1807 and Idaho Code § 34-708A Are Constitutional**

Even if Plaintiff had standing to raise his claims and if his claims were ripe, the residency requirement of Idaho Code § 34-1807 and the signature requirement of Idaho Code § 34-708A are constitutional.

1.      Standard of Review and Level of Scrutiny Regarding Constitutional Challenges to
        Election Statutes

Burdick v. Takushi, 504 U.S. 428 (1992), articulated in detail the standard of review and level of scrutiny applied to constitutional challenges to election statutes.  The Court rejected the "erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny."  504 U.S. at 432.  The Court explained that the State's important role in regulating elections necessarily imposes some reasonable burdens upon voters, candidates, and political parties:

> **It does not follow … that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute**.  ...  **the Court … has recognized that States retain the power to regulate their own elections**.  Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, **there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes**.

> Election laws will invariably impose some burden upon individual voters.  Each provision of a code, "whether it governs the registration and qualifications of voters, the selection and **eligibility of candidates**, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S.Ct. 1564, 1569-1570, 75 L.Ed.2d 547 (1983).  Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently.  …

Id. at 433 (emphasis added) (some internal quotation marks and citations omitted).

In lieu of applying strict scrutiny to every constitutional challenge of election laws, the Burdick Court reaffirmed that "a more flexible standard applies."  Id.

> A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.

MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 9

Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance.   But **when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions**. *Anderson*, 460 U.S. at 788, 103 S.Ct. at 1569-1570.

Id. at 434 (emphasis added) (some internal quotation marks and citations omitted); see also

Washington State Grange v. Washington State Republican Party, __ U.S. __, 128 S.Ct. 1184,

1192 (2008) ("If a statute imposes only modest burdens, [] then 'the State's important regulatory

interests are generally sufficient to justify reasonable, nondiscriminatory restrictions' on election

procedures."), *quoting* Anderson v. Celebrezze, 460 U.S. 780, 788 (1983).

Idaho's minimal threshold for ballot qualification of Independent candidates, as set forth

in Idaho Code §§ 34-1807 and 34-708A, is precisely the type of regulation contemplated by the

Supreme Court in cases such as Burdick, Anderson, and Jenness v. Fortson, 403 U.S. 431 (1971),

discussed below.  Idaho's sole requirement that circulators of petitions be residents of Idaho,

coupled with the negligible 1% signature requirement, ensure that Idaho's ballot remains orderly

and understandable and that candidates have displayed a modicum of support prior to accessing

the ballot.  Plaintiff seeks unfettered ballot access in Idaho, which would lead to the type of

"laundry list," chaotic ballots that have been consistently resisted by both the states and the

courts.  As the Constitution itself provides and as the Supreme Court has confirmed, the process

of regulating elections is left largely to the States' discretion.  See U.S. Const. art. II, § 1 ("Each

state shall appoint, **in such manner as the Legislature thereof may direct**, a number of

electors" for the presidential election) (emphasis added); see Burdick, 504 U.S. at 433.

2.     Idaho Code § 34-1807's Residency Requirement for Petition Circulators Is a Reasonable, Non-Discriminatory Requirement for Access to the Ballot

Plaintiff challenges Idaho Code § 34-1807, which provides that "[a]ny person who circulates any petition for an initiative or referendum shall be a resident of the state of Idaho … ."  Petitions filed in conjunction with an Independent candidate's declaration of candidacy must comply with this requirement.  Idaho Code § 34-708A.

     *a.     Idaho's Residency Requirement Must be Examined in Light of the Entire Statutory Scheme Regulating Ballot Access*

Defendant anticipates that Plaintiff will rely heavily on Nader v. Brewer, 531 F.3d 1028 (9th Cir. 2008), which examined the burdens of Arizona election statutes on Independent candidates' access to the ballot.  In Nader, the court held that Arizona's more restrictive voter-eligibility requirement for the circulation of petitions was part of a scheme that created a severe burden on the plaintiffs' rights, therefore meriting strict scrutiny.  Nader, 531 F.3d at 1036.

Arizona's statutory scheme was far more burdensome as a whole than Idaho's.  Idaho's residency requirement should not be examined in a vacuum, but should instead be analyzed in the context of Idaho's less burdensome statutes for attaining ballot access.  See, e.g., Jenness v. Fortson, 403 U.S. 431, 437-39 (1971) (examining the burdens imposed by a statutory scheme as a whole and noting that the relevant, collective election statutes provided for reasonable access to the ballot, as opposed to an "entangling web of election laws" that had been struck down in a different state).  As the Nader court recognized:  **"[T]he burden on plaintiffs' rights should be measured by whether, in light of the entire statutory scheme regulating ballot access, 'reasonably diligent' candidates can normally gain a place on the ballot**, or whether they will rarely succeed in doing so." Nader, 531 F.3d at 1035 (emphasis added) (internal citations omitted), citing to Libertarian Party of Washington v. Munro, 31 F.3d 759, 762 (9th Cir. 1994).

**b.      *Idaho's Statutory Scheme Regulating Ballot Access is Far Less Burdensome than the Arizona Statutes at Issue in <u>Nader v. Brewer</u>***

In contrast to the statutory scheme examined in <u>Nader</u>, Idaho's statutes as a whole are far less burdensome than Arizona's statutes, and "'reasonably diligent' candidates can normally gain a place on the ballot."  <u>Id.</u>  Idaho requires only residency for the circulation of petitions; in other words, an Idaho resident may circulate petitions even if that resident is not qualified to register to vote because he or she is a minor, a convicted felon, or a non-citizen.  <u>See</u> Idaho Code § 34-1807.

Furthermore, Idaho only requires an Independent candidate to collect signatures of "1% of the number of votes cast … for presidential electors at the previous general election at which a president … was elected," or 6,550 signatures for the 2012 presidential election.[1]  Idaho Code § 34-708A; Ysursa Aff., ¶ 3.  In addition, Idaho does not require the candidate to submit those signatures to the Office of the Secretary of State until August 25th, which in 2012 will be only 73 days before the general election.  Idaho Code § 34-708A; Idaho Code § 34-101 (setting the general election for the first Tuesday following the first Monday in November, which falls on November 6, 2012).  Several candidates, including Ralph Nader, have successfully met the requirements of Idaho's statutes to qualify for the general election ballot.  Statement of Facts, ¶¶ 14-19; <u>Nader</u>, 531 F.3d at 1035, citing to <u>Libertarian Party</u>, 31 F.3d at 762 ("To determine the severity of the burden, we said [in <u>Libertarian Party</u>] that past candidates' ability to secure a place on the ballot can inform the court's analysis.")

In contrast to Idaho's minimal statutory requirements for ballot access, Arizona's statutes as a whole constituted a severe impediment to access to the Arizona ballot.  The Arizona statutes

---

[1]    Idaho Code § 34-708A's signature requirement is discussed in more detail in Section B(3), below. (<u>See</u> pages 17-22.)

MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 12

at issue in <u>Nader</u> required that circulators of petitions had to be **qualified to register to vote** in Arizona.  <u>Nader</u>, 531 F.3d at 1031.  Thus, Arizona's "residency plus" requirement restricted the pool of petition circulators far more than does Idaho's simple residency requirement.   In addition, Arizona also required a candidate to submit signatures equaling "3% of the registered voters in the political subdivision for which the candidate is nominated," which, in 2004, totaled 14,694 signatures for the office of President.  <u>Id.</u>  Furthermore, a candidate was required to submit these approximately 14,694 signatures by "90 days before the primary election," which in 2004 was June 9th, 146 days before the general election of November 2, 2004.  <u>Id.</u>  In sum, Arizona required an aspiring Independent candidate to collect nearly 15,000 signatures (3% of the previous election's voters), through petitions circulated only by individuals qualified to register to vote in Arizona, which had to be submitted 146 days – or almost five months – before the general election.  <u>Id.</u>  As the <u>Nader</u> court tellingly observed, no Independent candidate had appeared on Arizona's ballot since prior to 1993, "which suggests that the regulations impose a severe burden that has impeded ballot access."  <u>Id.</u> at 1038.  In light of the entire statutory scheme and its observable effect on an Independent candidate's ability to qualify for the Arizona ballot, the <u>Nader</u> court held that Arizona's statutes imposed a severe burden on the plaintiffs' constitutional rights.  <u>Id.</u> at 1036.

In short, Defendant respectfully asserts that Idaho's residency requirement, particularly when viewed "in light of the entire statutory scheme regulating ballot access," <u>id.</u> at 1035, is

---

[3] At least one circuit has held that a residency requirement for the circulation of petitions does not impose a severe burden.  <u>Initiative & Referendum Institute v. Jaeger</u>, 241 F.3d 614, 617 (8th Cir. 2001.)  Although the <u>Nader</u> court declined to follow <u>Jaeger</u>, Defendant suggests that the severe burden present in <u>Nader</u> stemmed not from the residency requirement alone, but from the Arizona statutory scheme as a whole.  This Court previously held, when examining Idaho Code § 34-1807's residency requirement, that the requirement did not impose a severe burden in Idaho.  <u>Idaho United Coalition for Bears v. Cenarrusa</u>, 234 F.Supp.2d 1159, 1163-64 (D.Idaho 2001).

distinguishable from the Arizona statutes examined by the <u>Nader</u> court, and does **not** impose a severe burden on a Presidential candidate's constitutional rights, let alone on Plaintiff's constitutional rights.  In contrast to the Arizona statutory scheme at issue in <u>Nader</u>, Idaho allows a broader range of people to circulate petitions, requires fewer signatures as a percentage of the electorate, and allows more time for the candidate to gather and submit those signatures prior to the general election than did Arizona's unduly burdensome statutory scheme.  Idaho's "statute imposes only modest burdens," and "'the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions' on election procedures."[3] <u>Washington State Grange</u>, 128 S.Ct. at 1192, *quoting* <u>Anderson</u>, 460 U.S. at 788.   This is especially true as:

> [n]on-residents are still free to speak to voters regarding particular measures and may train residents on the best way to collect signatures. The statute does not prohibit non-residents from accompanying circulators. As *Jaeger* held, "[t]he one restriction is that out-of-state residents cannot personally collect and verify the signatures, and that restriction is justified by the State's interest in preventing fraud." *Id.* at 617.

<u>Idaho United Coalition for Bears v. Cenarrusa</u>, 234 F.Supp.2d 1159, 1164 (D.Idaho 2001), quoting <u>Initiative & Referendum Institute v. Jaeger</u>, 241 F.3d 614, 617 (8th Cir. 2001); Statement of Facts, ¶¶ 10-11.  As discussed below, the State's interests more than justify this reasonable restriction on the circulation of petitions.

### c.    *Idaho's Residency Requirement is Reasonable and/or Narrowly Tailored to Serve Compelling State Interests*

Even if strict scrutiny is applied to Idaho's residency requirement, the State's interests in regulating the petition process – and resulting access to the ballot – as well as preventing and prosecuting election fraud, are compelling interests that justify the requirement.  "A state's

interest in ensuring the integrity of the election process and preventing fraud is compelling." Nader, 531 F.3d at 1037. Idaho's residency requirement is narrowly tailored to address that compelling interest, if the "narrowly tailored" inquiry is applicable.

The requirement that petitions be circulated by Idaho residents "protect[s] the petition process from fraud and abuse by ensuring that circulators answer to the Secretary's subpoena power." Idaho United Coalition for Bears, 234 F.Supp.2d at 1163-64, quoting Jaeger, 241 F.3d at 616. There has been election fraud in Idaho regarding the circulation of petitions, as is shown by a recent case in which an individual purported to circulate election petitions, pled guilty to making false affidavits on a petition (forging signatures), and then absconded from her super-vised probation after pleading guilty. Statement of Facts, ¶ 12; Gilmore Aff., Ex. H. There have also been instances of individuals who circulated petitions for Idaho elections providing motels or hotels as their addresses, indicating that they may be transient and may not have ties to Idaho. Statement of Facts, ¶ 13; Ysursa Aff., ¶ 7 and Ex. A. As a practical matter, it would be difficult to locate and prosecute individuals who violate Idaho election laws while circulating petitions if those individuals are non-residents who can easily leave the jurisdiction. See Statement of Facts, ¶¶ 12-13. The State has a compelling interest in being able to exercise its subpoena power over individuals who submit fraudulent petitions, and out-of-state petition circulators are far more likely to avoid prosecution for election fraud. Idaho's residency requirement enables the State to meaningfully regulate the petition process and better ensure the prosecution of election fraud.

3.    Idaho Code § 34-708A's "One-Percent" Signature Requirement Is a Reasonable, Non-Discriminatory Requirement for Access to the Ballot

Plaintiff also challenges Idaho Code § 34-709A's requirement that Independent candi-dates for President must submit the signatures of "1% of the number of votes cast in this state for presidential electors at the previous general election at which a president of the United States

was elected." As noted previously, for the 2012 presidential election, the number of required signatures for an Independent candidate for President is 6,550.  Ysursa Aff., ¶ 3.

Jenness v. Fortson, 403 U.S. 431 (1971), is informative on this issue.  In Jenness, the plaintiffs challenged the constitutionality of a Georgia statute that required an Independent candidate to file a "nominating petition" signed by "a number of electors of not less than five per cent of the total number of electors eligible to vote in the last election for the filing of the office the candidate is seeking" in order to be listed on the ballot for the general election.  Jenness, 403 U.S. at 433.  Like Idaho, Georgia did not prohibit a voter from writing in an Independent candidate's name, even if that individual was not listed on the ballot.  Id. at 434.  The Court held that the 5% signature requirement did not violate the plaintiffs' constitutional rights and did not violate equal protection of the laws when compared to requirements imposed on other candidates, stating:  "**There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot** - the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election."  Id. at 442 (emphasis added).  The Court stated that "[t]he 5% figure is, to be sure, apparently somewhat higher than the percentage of support required to be shown in many States as a condition for ballot position," but noted with approval that Georgia provided for write-in candidates and permitted "any registered voter to sign as many nominating petitions as he wishes." Id.  The Court articulated: "Georgia's election laws … do not operate to freeze the political status quo.  In this setting we cannot say that Georgia's 5% petition requirement violates the constitution." Id. at 438.

The Supreme Court again addressed this issue in <u>American Party of Texas v. White</u>, 415 U.S. 767 (1974).  In <u>American Party</u>, the Court addressed Texas statutes that required gubernatorial candidates from minority parties to file petitions signed by 1% of the voters in the last gubernatorial election to qualify for the ballot.  The Court held that the signature requirement was a "constitutionally valid measure[], reasonably taken in pursuit of vital state objectives that cannot be served equally well in significantly less burdensome ways."  <u>American Party</u>, 415 U.S. at 781.  The Court articulated:

> "[A]ny fixed percentage requirement is necessarily arbitrary, but we agree … that the required measure of support – 1% of the vote for governor at the last general election and in this instance 22,000 signatures – falls within the outer boundaries of support the State may require before according political parties ballot position. To demonstrate this degree of support does not appear either impossible or impractical, and we are unwilling to assume that the requirement imposes a substantially greater hardship on minority party access to the ballot.

<u>Id.</u> at 783.  In upholding the requirement, the Court stated: "It affords minority political parties a real and essentially equal opportunity for ballot qualification.  Neither the First and Fourteenth Amendments nor the Equal Protection Clause of the Fourteenth Amendment requires any more." <u>Id.</u> at 787-88.

Idaho's signature requirement is even less burdensome than was Georgia's requirement, which was upheld in <u>Jenness</u>.  In Idaho, the Independent candidate need only submit the signatures of "**1%** of the number of **votes cast** … for presidential electors at the previous general election at which a president … was elected," while Georgia required "a number of electors of not less than **five per cent** of the total number of **electors eligible to vote** in the last election for the filing of the office the candidate is seeking," regardless of whether those electors actually voted in the prior election.  Idaho Code § 34-708A (emphasis added); <u>Jenness</u>, 403 U.S. at 433.  Under the reasoning of <u>Jenness</u> and <u>American Party</u>, Idaho's 1% signature requirement does not

impose an unconstitutional burden on ballot access.  This is particularly true, as, similar to Jenness, Idaho statutes also provide for write-in votes for Independent candidates.  Ysursa Aff., ¶ 4; Idaho Code § 34-702A.  As the Supreme Court stated in American Party: "Constitutional adjudication and common sense are not at war with each other, and we are thus unimpressed with the arguments that burdens like those imposed by Texas are too onerous, especially when two of the original party plaintiffs themselves satisfied these requirements."  Id. at 787.  As in Texas, Idaho has a history of successful satisfaction of its signature requirement and resulting ballot access by Independent candidates, including Ralph Nader.  Statement of Facts, ¶¶ 14-19.

Idaho's signature requirement imposes a minimal (and no more than reasonable) burden upon Independent candidates while supporting Idaho's important state interest "in avoiding confusion, deception, and even frustration of the democratic process at the general election" by ensuring that an individual listed as a candidate on the general election ballot has made a "preliminary showing of a significant modicum of support."  Jenness, 403 U.S. at 442.  "*Jenness* and *American Party* establish with unmistakable clarity that States have an 'undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot … .'"  Munro v. Socialist Workers Party, 479 U.S. 189, 194 (1986).

With respect to the issue of equal protection of the law, comparing access to the ballot by candidates associated with political parties versus Independent candidates:

> The fact is that there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization [or Independent candidates] on the other.   [Idaho] has not been guilty of invidious discrimination in recognizing these differences and providing different routes to the printed ballot. Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike .  …

Jenness, 403 U.S. at 441-42 (holding that Georgia's 5% signature requirement for Independent

candidates or minority-party candidates did not violate equal protection of the law.)  Idaho's 1% signature requirement for Independent candidates does not violate the Fourteenth Amendment right to equal protection of the laws.  See id.

Plaintiff also points to the fact that an Independent candidate for President is required to submit more signatures than Independent candidates for other statewide offices.  Complaint, ¶¶ 1, 18.  While an Independent candidate for a statewide office other than the office of President is only required to submit a petition with 1,000 signatures of qualified electors with his declaration of candidacy, his declaration of candidacy must be filed no later than the tenth Friday preceding the primary election (which is the same deadline as that established for candidates for a party primary).  Idaho Code § 34-708(2) (2008); Idaho Code § 34-704 (2008).  In 2012, the deadline for non-presidential, statewide Independent candidates to submit their declarations of candidacy will be March 16, 2012.  See Idaho Code § 34-102 (setting the primary election for the fourth Tuesday of May, which falls on May 22, 2012); Idaho Code § 34-704 (requiring declaration of candidacy to be filed by the tenth Friday preceding the primary election, which falls on March 16, 2012).  In contrast, an Independent candidate for President has until August 25th to file his declaration of candidacy and accompanying petition.  Idaho Code § 34-708A.  Thus, a presidential candidate is provided with more than five additional months to gather signatures. Id.; Idaho Code § 34-102; Idaho Code § 34-704.

Furthermore, the nature of the offices differs significantly, as presidential candidates are seeking to lead the entire country, and it is therefore reasonable for the State to require that presidential candidates show the ability to marshal more support than senatorial or gubernatorial candidates.  "There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a … candidate on the ballot,"

particularly when that candidate proposes to run for the highest office in the United States, rather than an office limited to the confines of Idaho's borders.  <u>Jenness</u>, 403 U.S. at 442 (emphasis added); <u>see</u> <u>also</u> <u>Storer v. Brown</u>, 415 U.S. 724, 730 (1974) ("[A]s a practical matter, there must be a substantial regulation of elections [and ballots] … if some sort of order, rather than chaos, is to accompany the democratic processes.")  The Supreme Court has held that states did not violate the right to equal protection of the laws when they required a greater number of signatures for Independent and minority-party candidates than for majority-party candidates for the **same office**.  It is also reasonable for a State to require a greater number of signatures for candidates for the office of President of the United States than for candidates for offices involving significantly less influence and fewer responsibilities.

In sum, Section 34-708A's signature requirement advances the State's important regulatory interest in avoiding potentially lengthy, costly, and confusing ballots that include candidates who have not demonstrated a requisite modicum of support for their candidacies, while still providing meaningful access to the ballot for Independent presidential candidates.

## CONCLUSION

For the foregoing reasons, Defendant the Hon. Ben Ysursa respectfully requests that this Court dismiss or deny Plaintiff's claims as a matter of law, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

DATED this 8th day of September, 2009.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

By _____ */s/ Karin D. Jones* _____
    MICHAEL S. GILMORE
    KARIN D. JONES
    Deputy Attorneys General

MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 20

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of September 2009, I electronically filed the foregoing MEMORANDUM IN SUPPORT OF DEFENDANT's MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system, which sent a Notice of Electronic Filing to the following persons:

Robert E. Barnes
The Bernhoft Law Firm, S.C.
207 E. Buffalo St., Ste. 600
Milwaukee, WI   53202

☐ U.S. Mail
☐ Hand Delivery
☐ Certified Mail, Return Receipt Requested
☐ Overnight Mail
☐ Facsimile: (414) 276-2822
☒ CM/ECF

Christ T. Troupis
Troupis Law Office PA
PO Box 2408
Eagle, ID   83616

☐ U.S. Mail
☐ Hand Delivery
☐ Certified Mail, Return Receipt Requested
☐ Overnight Mail
☐ Facsimile: (414) 276-2822
☒ CM/ECF

*/s/ Karin D. Jones*
Michael S. Gilmore
Karin D. Jones
Deputy Attorneys General

MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 21