Daniel J. Treuden, Wis. Bar # 1052766
The Bernhoft Law Firm, S.C.
207 E. Buffalo Street, Suite 600
Milwaukee, Wisconsin 53202
(414) 276-3333 telephone
(414) 276-2822 facsimile
djtreuden@bernhoftlaw.com

Appearing *Pro Hac Vice*
for Plaintiff Donald N. Daien

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO
### SOUTHERN DIVISION

| | |
|---|---|
| DONALD N. DAIEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Case No. 1:09-cv-00022-REB |
| ) | |
| BEN YSURSA, in his official ) | |
| capacity as Secretary of State of ) | |
| Idaho, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF CONTEMPORANEOUS MOTION FOR SUMMARY JUDGMENT**

COMES NOW THE PLAINTIFF, Donald N. Daien ("Daien"), by and through his attorneys, The Bernhoft Law Firm, S.C., and files this Memorandum of Points and Authorities in Support of Daien's Motion for Summary Judgment seeking an entry of judgment in Daien's favor. This brief is filed separately from the motion pursuant to Local R. 7.1(b)(1). The issues in this case are pure issues of law, thoroughly addressed in favor of the plaintiff by controlling Ninth Circuit precedent in *Nader & Daien v. Brewer,* 531 F.3d 1028, 1036 (9th Cir. 2008).

## INTRODUCTION

Plaintiff seeks declaratory relief that two aspects of Idaho's election laws are facially unconstitutional. First, whether Idaho's petition circulator residency requirement violates important First Amendment political speech, expression, and associational rights; and second, whether Idaho can disparately require independent Presidential candidates to obtain approximately six times as many signatures for ballot access than other statewide independent candidates without violating those same constitutional rights.

Ninth Circuit controlling precedent conclusively resolves this case in Daien's favor. *See Nader & Daien v. Brewer*, 531 F.3d 1028, 1036 (9th Cir. 2008). In this recent decision, a unanimous Ninth Circuit panel struck down petition circulator residency requirements as violating the fundamental First Amendment rights of petition circulators. *See id.* Equally, the Ninth Circuit struck down discriminatory treatment of independent presidential candidates compared to similarly-situated candidates, invalidating Arizona's early deadline requirement for independent candidates since other candidates did not face the same burden. *See id.*

Moreover, the *Brewer* decision mirrored governing Supreme Court precedent in this most important ballot-access area of jurisprudence. The Supreme Court invalidated registration requirements for petition circulators on similar grounds. *See Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999) (holding that the right to circulate petitions is protected "core political speech" that cannot be limited except by the most narrowly tailored means and only when those means are necessary to a compelling state interest). The Supreme Court also invalidated discriminatory burdens on independent presidential candidates. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *see also Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979). As the Supreme Court and Ninth Circuit each held, states cannot

impose disparate ballot-access requirements for independents and their supporters. *See id*. Summary judgment is thus warranted.

### STATUTORY APPENDIX AND STATEMENT OF FACTS

Pursuant to Local R. 7.1(b)(1), Daien is filing concurrently with this memorandum a statement of undisputed material facts. These facts are relied upon in their entirety in support of this motion for summary judgment. Daien is also contemporaneously submitting a separate statutory authority appendix setting forth the text of the Idaho statutes at issue in this federal civil rights suit.

### LEGAL ARGUMENT

**A.    Standard of Review.**

Summary judgment should be awarded where there is no material fact in dispute and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The question of whether a statute is facially unconstitutional is a pure question of law. *See Village of Schaumberg v. Citizens for a Better Environment*, 444 U.S. 620, 634 (1980). For that very reason, the Supreme Court has already directed that issues of the unconstitutionality of circulator restrictions and First Amendment violations should be decided on summary judgment as matters of law. *See id.* at 634-35.

Binding Supreme Court and Ninth Circuit authority require the application of strict scrutiny. *See Brewer*, 531 F.3d at 1034-35. "[T]he residency requirement nevertheless excludes from eligibility all person who support the candidate but who . . . live outside the state of Arizona. Such a restriction creates a severe burden on . . . [the candidate's] out-of-state supporters' speech, voting and associational rights." *Id*. at 1036. Under strict scrutiny, the burden shifts to the Defendant Ben Ysursa ("Ysursa") to show that the residency restriction on speech and associational rights of circulators is narrowly tailored to meet a compelling state

interest, and that it seeks to protect its interest in a manner that is the least restrictive of protected speech.

The same strict scrutiny analysis applies to the state's discriminatory signature burden on independents.  In *Brewer*, the Ninth Circuit applied strict scrutiny to election-law burdens that imposed higher burdens on independents.  This followed governing Supreme Court precedent.  The Supreme Court applied strict scrutiny when striking down a 5% ballot-access signature requirement for a political subdivision of Illinois when the 5% requirement (in Cook County) demanded signatures in excess of the number of signatures required for general statewide ballot access.  *See Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979).  Independent Presidential candidates in Idaho find themselves in the same position as the non-partisan candidates in *Socialist Workers Party* found themselves.  A Presidential candidate in Idaho must obtain signatures totaling a particular percentage of the votes cast in the previous election, (I.C. § 34-708A – requiring 1%), and because that amount will exceed the number of signatures required for general statewide ballot access in regular statewide elections, strict scrutiny applies to this analysis.  *Compare* Decl. of Daniel J. Treuden, ¶ 3, Ex. A (requiring 6,550 signatures for a Presidential candidate), *and* I.C. § 34-708(2)(a) (requiring 1,000 signatures for a statewide candidate) (Facts, ¶¶ 6-7).  *See also Socialist Workers Party*, 440 U.S. at 183-85 (discussing strict scrutiny application).  Based on the foregoing, strict scrutiny applies.

**B.**     **History of States Regulating Voter Speech & Voter Choice.**

State control of the ballot was foreign to America's Founders.  *See* Richard Winger, *History of U.S. Ballot Access Law for New and Minor Parties*, The Encyclopedia of Third Parties in America (2000);  *see also* A. Ludington, *American Ballot Laws, 1888-1910* (1911).  The invention of the state ballot originated in the late nineteenth century.  *See id*.  Before that, voters and their supporters could bring their own ballot to the voting polls.  *See id*. Most states adopted

the state ballot and employed a free and open ballot with few ballot access restrictions, during most of the subsequent half-century. *See id.* Even then, what restrictions did exist in a handful of states were quite modest: signature requirements around 500 or 1,000, with no deadline until 30 days prior to the general election. *See* Winger, *supra*. Consequently, for most of the first half-century of state ballot use, the ballot was open and free: any candidate who met the Constitutional qualifications for the office could be listed on the ballot by mere request. *See id.* Efforts to require signature totals above minimal thresholds – like 500 signatures – were summarily stricken by reformist courts as clearly and patently violating the very intent of these reform laws. *See People ex. rel. Hotchkiss v. Smith*, 99 N.E. 568 (N.Y. 1912).

It was only when third parties and candidates outside the two-party system began to seriously challenge for power or reshape the debate in ways the political incumbents found threatening that state approaches to the state ballot access began to change. *See e.g.,* Richard H. Pildes, *The Theory of Political Competition*, Va. L. Rev., Nov. 1999, 1605, 1617 (noting "the history of ballot access restrictions which get elevated just as serious new parties or independent candidates emerge as threats"); A. James Reichley, *The Future of the Two-Party System After 1996*, in The State of the Parties 14 (John C. Green & Daniel M. Shea, eds. 3d ed. 1999) ("The representatives of the two major parties have taken pains to enact election laws that strongly favor major party candidates"); *The Law of Democracy: Legal Structure of the Political Process* (Samuel Issacharoff, Pamela S. Karlan, and Richard H. Pildes eds., Foundation Press 2d ed. 2001) (noting "the self-interest existing power holders have in manipulating the ground rules of democracy in furtherance of their own partisan, ideological, and personal interests"); Brian P. Marron, *Doubting America's Sacred Duopoly: Disestablishment Theory & The Two-Party System*, 6 Tex. F. on C.L. & C.R. 303 (2002); Samuel Issacharoff, *Oversight of Regulated*

*Political Markets*, 24 Harv. J.L & Pub Policy 91, 96-97 (2000) (the natural side effect of politicians overseeing the terms and conditions of their competition).

Outsider options through third-party campaigns or candidacies provide the most effective method of venting for those feeling excluded from the two-party system but does so within the system: channeling dissent through democratic means and giving voice to that dissent, dissent that led to abolition, direct election of senators, the right of women and draft-eligible citizens to vote, the right to overtime, the limits on child labor, aid to farmers, the graduated income tax, and expanded participation in the public arena with more confidence in American institutions as representative. *See e.g.,* John D. Hicks, *The Third Party Tradition in American Politics*, 20 Miss. Valley. Hist. Rev. 3 (1933); A. Ranney & W. Kendall, *Democracy & the American Party System* (1956); W. Goodman, *The Two-Party System in the United States* (1960); D. Mazmanian, *Third Parties in Presidential Elections* (1974); G. Sartori, *Parties and Party Systems* (1976); Rosenstone, Behr & Lazarus, *Third Parties in America* (1984).

With the slow, steady closing of the ballot, more and more independent and outside parties disappeared from potential choices for voters, disappeared from the public discourse, and disappeared from the public consciousness. Other scholars note how badly these restrictions limit the marketplace of ideas the First Amendment was intended to promote and protect. *See* Steven Rosenstone, *Restricting the Marketplace of Ideas: Third Parties, Media Candidates & Forbes' Imprecise Standards*, 18 St. Louis U. Pub. L. Rev. 485 (1999). The Supreme Court concurred in its seminal decision in *Anderson*. *Anderson*, 460 U.S. at 791-92.

The public increasingly concurs, as they refuse partisan labels in registration, voting patterns and public opinion, while seeking more options for debate participants in Presidential debates and more options for choices on the ballot. *See The Appleseed Center for Electoral Reform and the Harvard Legislative Research Bureau*, *A Model Act for the Democratization of*

6

*Ballot Access*, 36 Harvard J. on Legislation 451, 454 (noting wide spread public desire for third options outside the two-party system in consistent public opinion surveys). It is for this reason that those judicial decisions closing the ballot and suppressing speech are subject to some of the fiercest criticism by legal scholars. See Bradley A. Smith, *Judicial Protection of Ballot-Access Rights: Third Parties Need Not Apply*, 28 Harvard Journal on Legislation 167 (1991). Recent jurists agree: they routinely complain how "arcane" ballot access laws appear as "nothing more than incumbent protection devices." *See Dotson v. NYC Board of Elections*, 2001 WL 1537689 (N.Y. Sup. 2001). As the Supreme Court noted in *Anderson*: "it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Anderson*, 460 U.S. at 793. This Court should prudently heed the Supreme Court's skepticism in this case as well.

C.  **The Residency Requirement For Ballot-Access Petition Circulators For Presidential Candidates is Facially Unconstitutional.**

Idaho limits the right to circulate Presidential petitions to those who are "a resident of the state of Idaho and at least eighteen (18) years of age." I.C. § 34-1807. This limitation on the right to circulate petitions infringes on core political speech and is not a narrowly tailored means to protect any compelling state interest, and has been condemned by recent Ninth Circuit authority. *See Brewer*, 531 F.3d 1028. Conditioning "core political speech" rights on state residency cannot be tolerated. The Ninth Circuit held exactly so in *Brewer* when this Circuit struck down an Arizona statute's residency requirement identical to Idaho's residency requirement found in I.C. § 34-1807. The Ninth Circuit rightfully relied on Supreme Court precedent, including *Buckley*, 525 U.S. 182, where the Supreme Court found unconstitutional the registration restriction on the speech rights of potential petition circulators. *See id*.

7

Twelve Circuit judges from four different Circuits examined the same resident-only petition circulator issue and came to a unanimous conclusion: prohibiting all non-residents from circulating petitions violated their First Amendment rights. *See e.g., Brewer*, 531 F.3d 1028; *Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023 (10th Cir. 2008); *Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008); *Krislov v. Rednour*, 226 F.3d 851, 858-66 (7th Cir. 2000). All of these Circuit decisions simply followed the governing logic of Supreme Court precedent: petition circulation is "core political speech" and protecting such speech reaches its "zenith" when someone is circulating a petition. *Buckley*, 525 U.S. at 186 (*quoting Meyer v. Grant*, 486 U.S. 414, 422, 425 (1988)). This requires "exacting" and "strict" scrutiny. *Meyer*, 486 U.S. at 421; *see also Buckley, supra*. This is because elections are as much a means of disseminating ideas and expressing dissent, often evolving and shifting with the sands of a campaign season, as they are means of attaining office and political objectives. *See Socialist Workers Party*, 440 U.S. at 186. In *Buckley*, the Supreme Court struck down a requirement that limited speech rights to the right to vote in the local community, by requiring petition circulators be registered voters.

Since the Supreme Court decided *Buckley*, the federal courts routinely and regularly strike down state law requirements that petition circulators could only circulate petitions to those in the same area where they could vote. *See e.g., Brewer,* 531 F.3d 1028; *Nader v. Blackwell*, 545 F.3d 459, 476 (6th Cir. 2008); *Krislov v. Rednour*, 226 F.3d 851, 858-66 (7th Cir. 2000); *Frami v. Ponto*, 255 F.Supp.2d 962 (W.D. Wis. 2003); *Morrill v. Weaver*, 224 F.Supp 882, 904 (E.D. Penn. 2002) (Permanent injunction granted holding Pennsylvania residency requirement unconstitutional under *Buckley* and *Lerman*); *Chandler v. City of Arvada, Colorado*, 292 F.3d 1236 (10th Cir. 2002); *Lerman*, 232 F.3d at 145-54 (New York requirement that witnesses to ballot access designating petitions be resident of the political subdivision in which the office or position is to be voted for held unconstitutional); *Nader 2000 Primary Committee, Inc. v.*

8

*Hechler*, 112 F.Supp.2d 575, 579 (S.D.W.V. 2000) (preliminary injunction granted where court found that "*Buckley* strongly suggests the West Virginia statute's resident registered voter requirement for petition circulators is presumptively unconstitutional"); *Nader 2000 Primary Committee, Inc. v. Hazeltine*, 110 F.Supp.2d 1201, 1205 (D.S.D. 2000) (South Dakota requirement that petition circulator be registered voters "became a nullity with the [*ACLF*] decision"); *Bernbeck v. Moore*, 126 F.3d 1114, 1117 (8th Cir. 1997) (pre-*ACLF* decision holding unconstitutional Nebraska law requiring petition circulators to be registered voters); *Lawrence v. Jones*, 18 P.3d 1245 (Ariz. App. 2001) (ruling that cities cannot limit circulator rights to city voters); 1999 Nev. Op. Atty. Gen. No. 37 (Dec. 1, 1999) (Nevada provisions requiring initiative petition circulators to be registered voters are unenforceable); 82 Ops. Cal. Atty. Gen. 250 (Dec. 22, 1999) (circulators of initiative petitions need not declare they are residents and voters).

The Ninth Circuit's logic in *Brewer* paralleled that of prior courts facing the identical issue and presaged the incipient trend in all the federal courts. *See Frami v. Ponto*, 255 F.Supp.3d 962 (W.D. Wis. 2003). Wisconsin, like Arizona and Idaho, imposed residency restrictions on petition circulators. Relying on *Buckley* and the Seventh Circuit case *Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000), the district court struck down Wisconsin's residency requirement since the requirement could not be narrowly tailored to protect a compelling state interest. Judge Crabb found that *Krislov*'s voter registration requirement was a *de facto* residency requirement, *Frami*, 255 F.Supp.2d at 967, and effectively extended *Krislov*'s holding to the broader issue: residency requirements: "When the Government defends a regulation on speech as a means to . . . prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured." *Krislov*, 226 F.3d at 865 (internal quotations omitted) (cited in *Frami*, 255 F.Supp.2d at 970). Moreover, the state must "show that the recited

9

harms are real, not merely conjectural and that the regulation will in fact materially alleviate the anticipated harm." *Frami*, 255 F.Supp.2d at 970 (internal quotations omitted).  Wisconsin's "parade of horribles" assertion failed to show how the residency requirement was narrowly tailored to protect a compelling state interest.

So, too, all of Arizona's arguments in *Nader* failed to show the residency requirement was narrowly tailored:  "Federal courts have generally looked with favor on requiring petition circulators to agree to submit to jurisdiction for purposes of subpoena enforcement, and the courts have viewed such a system to be more narrowly tailored means than residency requirement to achieve the same result." *Id.* (citing *Chandler*, 292 F.3d at 1242-44;  *Krislov*, 226 F.3d at 866 n.7;  and *Frami*, 225 F.Supp.2d at 970).  Every Circuit applying strict scrutiny agrees:  banning all non-residents from core political speech cannot conform to First Amendment protections.  The Idaho residency requirement cannot survive the required constitutional analysis.

D. **The Signature Requirements for Presidential Ballot Access Are Greater Than All Other Statewide Candidates, and Are Therefore Unconstitutional, Especially When the State Has Less of an Interest in Presidential Elections Than Idaho Statewide or Local Elections.**

Independent Presidential candidates in the 2012 election cycle will have to collect approximately 6,550 signatures to be ballot qualified in Idaho, *see* I.C. § 34-708A and Treuden Decl., ¶ 3, Ex. A and Facts, ¶ 6, while statewide candidates for non-Presidential offices will only need 1,000 signatures to be ballot qualified in Idaho, *see* I.C. § 34-708(2)(a) and Facts, ¶ 7. Strict scrutiny again applies to this analysis, requiring Ysursa to set forth a compelling state interest the extra signature statute is designed to protect and that the statute is narrowly tailored to protect that interest.  Ysursa simply cannot prevail in this important regard, especially when the Supreme Court has held that a "State has a less important interest in regulating Presidential

10

elections than statewide or local elections because the outcome of the former will be largely determined by voters beyond the State's boundaries." *Anderson*, 460 U.S. at 795.

*Socialist Workers Party* controls the constitutional analysis of I.C. § 34-708A. In *Socialist Workers Party*, the High Court struck down an Illinois statute requiring signatures totaling 5% of the total number of persons that voted in the previous election to obtain ballot access. In Cook County, there were over 700,000 persons that had voted in the previous election, which in turn required independent candidates to collect over 35,000 signatures in the subsequent election. *Socialist Workers Party*, 440 U.S. at 183. Another statute, however, allowed independent candidates to gain ballot access to a statewide office if they obtained 25,000 signatures. *Id*. at 186. The district court in *Socialist Workers Party* succinctly relied on an Eastern District of Arkansas decision as the basis to strike down the statute. *Id*. at 179.

> On the merits of appellees' equal protection challenge, the [district] court found "[no] rational reason why a petition with identical signatures can satisfy the legitimate state interests for restricting ballot access in state elections, and yet fail to do the same in a lesser unit. *Lendall v. Jernigan*, 424 F.Supp. 951 (E.D. Ark. 1977). Any greater requirement than 25,000 signatures cannot be said to be the least drastic means of accomplishing the state's goals, and must be found to unduly impinge [on] the constitutional rights of independents, new political parties, and their adherents."

*Id*. (quoting *Socialist Workers Party v. Chicago Bd. of Election Comm'rs*, 433 F.Supp. 11, 20 (N.D. Ill. 1977)).[1]

"The Illinois Legislature has determined that its interest in avoiding overloaded ballots in statewide elections is served by the 25,000-signature requirement. Yet appellant has advanced no reason, much less a compelling one, why the State needs a more stringent requirement for Chicago." *Socialist Workers Party*, 440 U.S. at 186.

---

[1] It is interesting that this quotation suggests that the higher signature requirement cannot even be supported by "any rational reason" because, while a state must comply with strict scrutiny, it will be unable to survive even the rational basis test.

Idaho finds itself with the same disparate situation here.  It is of no consequence that *Socialist Workers Party* was dealing with a geographic sub-division of Illinois and this case involves the same geographic district:  a statewide district.  The salient fact is that there are different ballot access requirements for different offices in the same election district.  Ysursa must still set forth a compelling reason, just like *Socialist Workers Party* required, for the higher signature requirement.  He will have to point to some unique fact regarding Presidential elections as compared to solely Idaho intra-state elections to justify the additional burden on Presidential ballot access, but that burden is insurmountable given the fact that Idaho has a lesser interest in the Presidential election than it does in solely Idaho intra-state elections.  *Anderson*, 460 U.S. at 795.

Because there is no legitimate basis to conclude that a higher signature requirement for a Presidential independent candidate is appropriate when compared to other independent statewide candidates, the higher signature requirement violates equal protection, and summary judgment is appropriately granted to Daien.

## **CONCLUSION**

Circulating petitions for a candidate for the Presidency is the core of political speech and the apex of First Amendment rights.  Limiting that right to only Idahoans when every other American has a right to exercise their core political speech in Idaho, cannot pass strict scrutiny – or any scrutiny, for that matter.

Similarly, requiring Presidential candidates to obtain approximately six times as many signatures than other statewide candidates to achieve a place on the election ballot violates the Equal Protection Clause.  This requirement cannot pass a rational basis standard, much less strict

scrutiny, given the fact that Idaho has less of an interest in Presidential elections than it does in solely Idaho statewide or local elections.

For all of these reasons, summary judgment is appropriate, finding I.C. § 34-1807's petition circulator residency requirement and I.C. § 708A's requirement that a Presidential candidate submit petitions signed by persons totaling 1% of the number of votes in the prior election in excess of demands on similarly situated state-wide candidates, violate the First and Fourteenth Amendments to the United States Constitution.

Respectfully submitted this 8th day of September, 2009.

                THE BERNHOFT LAW FIRM, S.C.
                Attorneys for the Plaintiffs


                 /s/ Daniel J. Treuden
                Daniel J. Treuden, Esquire
                *Pro Hac Vice* Counsel

                207 East Buffalo Street, Suite 600
                Milwaukee, Wisconsin 53202
                (414) 276-3333  telephone
                (414) 276-2822  facsimile
                djtreuden@bernhoftlaw.com