Daniel J. Treuden, Wis. Bar # 1052766
The Bernhoft Law Firm, S.C.
207 E. Buffalo Street, Suite 600
Milwaukee, Wisconsin 53202
(414) 276-3333 telephone
(414) 276-2822 facsimile
djtreuden@bernhoftlaw.com

Appearing *Pro Hac Vice*
for Plaintiff Donald N. Daien

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO
## SOUTHERN DIVISION

|  |  |
|---|---|
| DONALD N. DAIEN,<br><br>    Plaintiff,<br><br>       v.<br><br>BEN YSURSA, in his official capacity as Secretary of State of Idaho,<br><br>    Defendant. | Civil Case No.  1:09-cv-00022-REB |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW THE PLAINTIFF, Donald N. Daien ("Daien"), by and through his

attorneys, The Bernhoft Law Firm, S.C., (Attorney Daniel J. Treuden, admitted *pro hac vice*),

and files this Memorandum of Points and Authorities in Opposition to the Defendant's Motion

for Summary Judgment.  This brief is filed separately from the motion pursuant to Local R.

7.1(b)(1).  Furthermore, because this brief required twenty-five pages, a concurrent motion for

leave to file an overlength brief has also been filed.

## INTRODUCTION

Daien has standing and the issues are ripe for adjudication because Daien has set forth an injury in fact, based on a concrete and particularized plan to engage in conduct violative of the statutes at issue, the harms are actual and imminent, not conjectural or hypothetical and directly related to the likely criminal enforcement of the statutes at issue by the defendant, and Daien's present and future injuries would be redressed by the declaratory and injunctive relief sought in the Complaint. As the Supreme Court aptly articulated: "When the plaintiff has alleged an intention to engage in a courts of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (quoting *Doe v. Bolton*, 410 U.S. 179, 188 (1973)). This is especially true in First Amendment cases and election-related disputes where the courts deliberately encourage a broad definition of standing and invite early pre-election adjudication to avoid mid-election judicial infringement and hasty decision-making. *See LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155-55 (9th Cir. 2000).

Furthermore, strict scrutiny applies to this case in light of *Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008) (hereinafter "*Nader*") and all of the case law cited therein because the regulations place a heavy burden on the First Amendment speech and associational rights of Daien, and on Daien's Fourteenth Amendment equal protection rights. Finally, Ben Ysursa ("Ysursa") fails to set forth why the statutes in question are narrowly tailored to protect a compelling state interest. Instead, Ysursa contradicts his own filings before the United States Supreme Court. *See* Brief of Amicus Curiae at 8, *Brewer v. Nader and Daien*, 129 S.Ct. 1580 *filed before* U.S. Supreme Court (No. 08-648) (Dec. 17, 2008) (2008 WL 5328210) (asking the Supreme Court to reverse the Ninth Circuit's decision because the decision clearly struck down

residency requirements like the one in Idaho and because it manifestly made strict scrutiny the appropriate analysis for such election laws.) Therefore, Ysursa's motion for summary judgment should be denied.

## STATEMENT REGARDING MATERIAL FACTS

Daien does not oppose any of Ysursa's Material Facts set forth in his summary judgment papers, and affirmatively incorporates the Statement of Material Facts set forth in Daien's motion for summary judgment, (Doc. 29-3), as fully set forth herein. Ysursa is not entitled to summary judgment, not because Ysursa's material facts set forth in his motion for summary judgment are in dispute, but rather because those material facts support summary judgment in Daien's favor. It is Ysursa's legal conclusions and factual inferences that are improper, unreasonable, or legally unjustified given the current state of the law.

## LEGAL ARGUMENT

**A.**    **Daien Has Standing and the Case is Ripe for Review.**

*1.*    *Standing.*

Plaintiffs must merely establish at this procedural stage of the case "only that there is a genuine question of material fact as to the standing elements" to deny the defendant's motion for summary judgment on the issue. *See Truth v. Kent Sch. Dist.*, 524 F.3d 957, 965 (9th Cir. 2008); *see also Marijuana Policy Project v. Miller*, 578 F.Supp.2d 1290, 1299 (D. Nev. 2008).

Ysursa claims Daien must wait until the middle of election season to file suit, and even then, implies he couldn't sue. Neither constitutional constrictions of jurisdiction nor prudential provisions of judicial economy so dictate. Ironically, and notably, when Nader and his supporters waited until the election season to file suit in the last couple of election cycles, they were often denied relief on "laches" or other grounds for filing suit *too late*, with courts condemning Nader for waiting until the middle of election season to file suit. *See Nader v.*

*Brewer*, 386 F.3d 1168 (9th Cir. 2004) (denying preliminary injunctive relief because of difficulties of deciding such issues in the middle of an election);  *see also Nader v. Keith*, 385 F.3d 729, 736 (7th Cir. 2004).  Notably, the courts' unanimous assumption for such denial of relief during election season was that there "would be no question of his standing to seek such relief in advance of the submission or even circulation of any petitions."  *Keith*, 385 F.3d at 736. Now, of course, the states switch songs, claiming Daien cannot file suit before the election season either.  The contrary positions that the suit is not ripe before the election season and is too late during the election season renders the law beyond judicial challenge at any time, precisely what standing doctrine does not permit or prescribe.

This is especially true in First Amendment cases, where the courts continually demand a broad application of standing.  As a fellow district court just recently concluded in near identical litigation, whenever "the potential enforcement of the challenged statute implicates First Amendment rights, 'the inquiry tilts dramatically toward a finding of standing.'"  *Marijuana Policy Project*, 578 F.Supp.2d at 1300 (quoting governing Ninth Circuit precedent in *LSO, Ltd.*, 205 F.3d at 1154-55).  Prior enforcement of the statute and merely wishing to engage in such speech in the future conferred standing on the plaintiffs challenging a statute on First Amendment grounds.  *See Am. Civil Liberties Union of Nevada v. Heller*, 378 F.3d 979, 983-84 (9th Cir. 2004).

As is, there is clearly a controversy capable of clear adjudication, as the plaintiff faces a realistic threat from prospective state action in enforcement of a specific statute against his cognizable interests and protected rights.  As the twin district courts concluded, all that is required for standing is three-fold:  (1) "evidence that in the past they have engaged in the type of speech affected by the challenged government action";  (2) "affidavits or testimony stating a present desire, though no specific plans, to engage in such speech";  and (3) "a plausible claim

4

that the presently have no intention to do so because of a credible threat that the statute will be enforced." *Marijuana Policy Project*, 578 F.Supp.2d at 1301 (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006)).

Here, Daien was the co-lead plaintiff in the Nader Ninth Circuit case establishing this right to relief for non-resident petition circulators, *see Nader*;  Daien has testified he has a present desire to circulate such petitions and see an independent candidate on the ballot, (Doc. 29-4, Decl. of Donald N. Daien, ¶ 3) (hereinafter "Daien Decl.");  and it is more than plausible that the state defendant will enforce this statute to prohibit and punish Daien should he do the activity precluded by existing law, (Doc. 28-5, Ex. H).

This finding of standing parallels and precisely compares to comparable cases.  Future petition signature gathering efforts conferred standing on the plaintiffs in the seminal Supreme Court case.  *See Buckley v. Am. Const. Law Foundation, Inc.*, 525 U.S. 182, 188 (1999).  Future petition signature gathering efforts conferred standing on the plaintiffs in comparable cases.  *See Tobin for Governor v. Illinois State Bd. of Elections*, 105 F.Supp.2d 882, 886 (N.D. Ill. 2000). Future intent to circulate petitions sufficed to confer standing on plaintiffs.  *Marijuana Policy Project v. Miller*, 578 F.Supp.2d at 1299;  *Idaho Coalition United for Bears v. Cenarrusa*, 234 F.Supp.2d 1159, 1162 (D. Idaho 2001).

## 2. *The Case is Ripe for Adjudication.*

Equally, the issues of standing and ripeness go hand-in-hand in this case.  Standing turns on whether Daien's claims are speculative or hypothetical and the ripeness issue turns on whether the action was premature.  If the facts support one issue, they will support the other.  *See Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) ("The constitutional component of the ripeness inquiry is often treated under the rubric of standing and, in many cases, ripeness coincides squarely with standing's injury in fact prong. . . .  Indeed,

because the focus of our ripeness inquiry is primarily temporal in scope, ripeness can be characterized as standing on a timeline.").  This is borne out in Ysursa's brief wherein he discusses the elements of standing in the ripeness section:  imminent prosecution, (Doc. 28-3, p. 7), concrete plan, (*id.*, p. 7), hypothetical situation, (*id.*, p. 7), and the likelihood of injury, (*id.*, p. 8).  Because the issue is primarily temporal in nature, the ripeness and standing issues completely overlap making their discussion indistinguishable for all intents and purposes and therefore, the parties' discussion of standing should equally apply to ripeness and vice versa.

The case is clearly ripe for judicial review as no additional fact is necessary to adjudicate the matter and failing to rule now would impair the First Amendment interest at stake and endanger future petition circulation campaigns in the state, including, critically, the planning stages of that effort.  Equally, waiting for an election, forces the court to decide hastily in the middle of an election, upsetting all kinds of public expectations and interests, precisely the reason the courts called for these disputes to be decided pre-election season when denying litigants like Nader and his supporters' legal relief in the past.

A plaintiff seeking declaratory or injunctive relief must first establish that he has standing to litigate the claims.  A plaintiff must show an injury-in-fact, a causal connection between the injury and the conduct complained of, and that the injury is likely redressed by a favorable decision.  *See LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1152-53 (9th Cir. 2000).  The Ninth Circuit has made the analysis simple when seeking prospective relief from the future application of a statute.  "It is sufficient for standing purposes that the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest and that there is a credible threat that the challenged provision will be used against the plaintiff."  *LSO*, 205 F.3d at 1154-55 (internal quotation omitted).  Daien meets these requirements.

Here, Daien has demonstrated that he intends to circulate nomination petitions for Ralph Nader, or another similarly-minded candidate, in the next Presidential election cycle.  (Daien Decl., ¶ 3) (Doc., 29-3, Daien's Statement of Material Facts, ¶ 2) (hereinafter "Facts"). Furthermore, Daien's conduct will run afoul of these statutes.  As a non-resident to Idaho, (Daien Decl., ¶ 3) (Facts, ¶ 1), his conduct will contradict the residency requirement found in I.C. § 34-1807.  Regarding the equal protection claim, Daien's associational rights and his own voting rights are violated by requiring Daien, and any associates working in concert with him, to obtain a greater than necessary number of signatures for ballot-access than Constitutionally permitted. *See Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983) ("A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment.") (regarding associational rights); *see also id*., 460 U.S. at 783 ("[The early deadline to submit nomination petitions] imposed an impermissible burden on the First Amendment rights of Anderson and his Ohio supporters ***and diluted the potential value of votes that might be cast for him in other States***.") (emphases added) (regarding Daien's voting rights).

Finally, Daien's conduct will be used against him, first, by the felony criminal penalties found in I.C. § 34-1822 for circulating Presidential nomination petitions as a non-resident. Regarding the equal protection claims, Daien's vote will be diluted if the candidate he supports is unavailable in Idaho because Idaho's signature requirements violate the Constitution.  These are current or imminent harms.

Imminent harm does not mean an immediate harm when considered within the context of a permanent injunction.  An immediate harm is only a necessary showing in a preliminary injunction context.  In a declaratory relief or permanent injunctive relief action, "imminent" means "likely" given the circumstances in the case.  "Although a showing of 'irreparable harm'

7

is required for the imposition of any injunctive relief, preliminary or permanent, the 'imminent'

aspect of the harm is not crucial to granting a permanent injunction." *Rodriguez ex rel.*

*Rodriguez v. DeBuono*, 175 F.3d 227, 235 n.9 (2nd Cir. 1999). Furthermore, "A finding of

'imminency' does not require a showing that actual harm will occur immediately so long as the

risk of threatened harm is present." *Dague v. City of Burlington*, 935 F.2d 1343, 1356 (2nd Cir.

1991) (issuing permanent injunction for environmental harm) (reversed in part on other grounds

related to an attorney fee award). And that makes sense here because there is a definite conflict

between the parties' positions with a known date the conflict will culminate and no indication

from either side that the conflict will resolve itself independent of this court's judgment. "The

basic inquiry [into whether a case or controversy exists] is whether the 'conflicting contentions

of the parties . . . present a real, substantial controversy between parties having adverse legal

interests, a dispute definite and concrete, not hypothetical or abstract." *Babbitt*, 442 U.S. at 298

(quoting *Railway Mail Assn. v. Corsi*, 326 U.S. 88, 93 (1945)).

Discussing the "imminent" requirement for preliminary injunctions, the Ninth Circuit

held "[a] plaintiff must do more than merely allege imminent harm sufficient to establish

standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to

preliminary injunctive relief." *Carribean Marine Services, Inc. v. Baldrige*, 844 F.2d 668, 674

(9th Cir. 1988) (emphasis omitted). Daien is not seeking a preliminary injunction, and

consequently the imminent showing related to temporal immediacy necessary to establish

standing in the permanent injunction context is much less than the preliminary injunction

showing of immediacy. Merely expressing an intention to do a future activity is sufficient. *See*

*LSO*, 205 F.3d at 1154-55.

That is exactly what we have here. We have Daien's stated (and unrefuted) intention to

perform an act he argues he has a constitutional right to do, particularly circulate nomination

petitions for Presidential candidates, and the right not to obtain more petition signatures than the equal protection clause allows. (Daien Decl., ¶ 5.) We know exactly when the controversy will completely blossom into actual harm, mainly during the petition drive process in 2012. We also have the Defendant's opposition without any indication that the Defendant will cure the harm before Daien must suffer the consequences of his contemplated actions (or decide to self-censor himself, which is itself a cognizable harm, *see Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)). Rather, the Defendant by the undisputed facts of this case has demonstrated a history of vigorous enforcement of its elections statutes. (Doc. 28-5, Ex. H.) By all indications, this is a definite and concrete dispute whether the action was filed one day before Daien plans to circulate petitions, or 3 years before. The harm is imminent because we know when it will occur, we know that it is likely the conflict will remain based on the parties' own actions and stated positions, and the parties are unable to point to any reasonably likely intervening event that would moot this issue. Daien clearly has standing to seek declaratory and injunctive relief on all counts.

### 3.     *Ysursa's Specific Challenges to Ripeness and Standing Fail.*

Notwithstanding Ysursa's legal interpretations to the contrary, the cases Ysursa relied on actually support a finding that standing exists on the undisputed facts of this case. Daien has articulated a plan related to the next election, namely, that he intends to support Ralph Nader or a similarly-minded person by circulating nomination petitions on their behalf in Idaho and other states in the 2012 election cycle, (Daien Decl., ¶ 5), has demonstrated that he has engaged in similar conduct in prior election, *see Nader*, 531 F.3d at 1030, and he will avoid Idaho in his ballot access petition circulation activities if it remains illegal during the next election cycle, (Daien Decl., ¶¶ 4 and 7). Daien satisfies the imminent harm prong in the standing analysis.

In *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000), the plaintiffs only alleged an intention to return to an environmentally distressed area if and when the area was cleaned up:

> FOE member Kenneth Lee Curtis averred . . . that he would like to fish, camp, swim, and picnic in and near the river between 3 and 15 miles downstream from the [polluting] facility, as he did when he was a teenager, but would not do so because he was concerned that the water was polluted by Laidlaw's discharges.

*Id*. at 181-82.

Other plaintiffs in *Friends of the Earth* made similar averments and the Supreme Court held that "the affiants' conditional statements" could not be considered "speculative 'some day' intentions." *Id*. at 184.  The Supreme Court quoted *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-63 (1992) in *Friends of the Earth* favorably when it said that "'the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing.'" *Friends of the Earth*, 528 U.S. at 183 (quoting *Defenders of Wildlife*, 504 U.S. at 562-63)).  The focus on whether a plan is speculative or not is whether the plaintiff sets forth a cognizable interest, and Daien has done just that because circulating nomination petitions is a cognizable interest in and of itself.

Daien states a cognizable interest even if he cannot name which candidate he will support with 100% certainty.  Indeed, a plaintiff had standing to sue the State of Hawaii over that state's ban on write-in candidates because the plaintiff intended in the future to vote for some future unknown write-in candidates.  "[T]he State points to the fact that Burdick cannot vote in some of the elections affected by the preliminary injunction and the fact **that he has failed to identify a particular candidate for whom he wants to cast his write-in vote**." *Burdick v. Takushi*, 937 F.2d 415, 417 (9th Cir. 1991) (emphasis added).  The Ninth Circuit rejected this contention by finding that the right to vote is independently a cognizable interest.

> Burdick has demonstrated that his rights as a voter to freedom of expression and association are threatened by Hawaii's prohibition on write-in voting.  Although an order striking down the prohibition on write-in voting may apply to races in which Burdick cannot vote, the State cannot contend that there is any difference in the way the prohibition applies to the various elections throughout the state. **The prohibition is a general statewide restriction that affects Burdick personally, and therefore he has standing to challenge it.**  *See Erum v. Cayetano*, 881 F.2d 689, 691 (9th Cir. 1989) (Hawaii voter has standing to challenge the whole of the State election laws creating ballot access restrictions).

*Burdick*, 937 F.2d at 417-18 (emphasis added) (affirmed by *Burdick v. Takushi*, 504 U.S. 428 (1992)).

Daien's case is similar in all material respects.  Daien's right to directly participate in the First Amendment activity of circulating ballot-access petitions is not dependent on a particular candidate.  Rather, Daien is completely barred from circulating all ballot-access petitions by a general statewide restriction, and the rights obviously personally affect Daien's ability to circulate those petitions.  It should also be noted again, that Daien's rights as an Arizona voter are also affected by the restriction because his vote is diluted whenever another state's ballot access regulation unconstitutionally restricts a candidates' access to the ballot.  *See Anderson*, 460 U.S. at 793.  Daien's right to freedom of association are also affected.  *Id*. at 793.  Just like the plaintiff in *Burdick* could not identify which candidate he intended to write-in, Daien's inability to precisely identify the candidate he will support does not make his residency claim and equal protection claim fail for lack of standing.  His right to circulate petitions and his right to not have his vote diluted by Idaho's unconstitutional restrictions on Presidential candidates is a cognizable right independent of the particular candidate he will support.[1]

---

[1] Ysursa's insinuation that Daien "is speculating whether Mr. Nader – or any Independent candidate, for that matter – will run for President in Idaho in 2012," (Doc. 28-3, p. 5), and that this somehow makes this case "hypothetical" is ludicrous, on the one hand, and results in circular reasoning, on the other.  Independent candidates are commonplace in recent decades and there is no reason to think that the 2012 Presidential election will have no independent candidates.  Furthermore, the very existence of the regulations at issue in this case may actually prevent some

Finally, Ysursa's claim that Daien is alleging a generalized threat of prosecution is also not a reasonable conclusion given the undisputed facts in this case. Ysursa himself set forth as undisputed fact that as recently as 2004, the state of Idaho has prosecuted someone for election law violations imprisoning the person for two years. (Doc. 28-5, Ex. H-8.) The sentence was suspended and the defendant placed on probation. *Id.*, Ex. H-9. Ultimately the probation was revoked and a bench warrant was issued. *Id.*, Exs. H-10 and H-11. The only reasonable inference from these facts related to Daien's fear of prosecution is that the State of Idaho is diligently enforcing its election law statutes and regulations. Daien's fears are not obtuse or generalized. This fact greatly increases Daien's fear of prosecution and significant penalties affecting Daien's finances and liberty interests.

Furthermore, and as Daien articulated in his declaration, he is curtailing his activities in Idaho as a direct result of these criminal statutes. (Daien Decl., ¶ 7.) The Idaho District Court has previously recognized a plaintiff's standing and the case's ripeness based on the "chilling effect" potential criminal prosecution had on a plaintiff.

> The bottom line is that plaintiffs' asserted harm is not "imaginary" or "speculative." As discussed above, plaintiff Rankin testified that he has curtailed his initiative activity because he is concerned about criminal liability. It is this chilling effect, rather than any actual criminal prosecution or a prosecutor's threat to prosecute, that renders the case ripe for resolution: "[T]he alleged danger is, in large measure, one of self-censorship: a harm that can be realized without an actual prosecution." *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 . . . (1988). The Court therefore rejects Idaho's argument that the case is not ripe for resolution.

*United for Bears*, 234 F.Supp.2d at 1162.

---

independent candidates from filing declarations of candidacy, because the candidates might count the costs and decide to expend their limited resources in states that do not violate their Constitutional rights. The potential lack of independent candidates cannot possibly be used to find a lack of standing when the remedy sought would increase the chances that independent candidates will run. If that were the case, then the more restrictive the regulation, the less likely anyone would have standing to challenge it.

In *United for Bears*, Judge Windmill considered *Thomas*, one of Ysursa's primary legal precedents relied in his motion for summary judgment.  Judge Windmill found that, even though the plaintiff faced no actual threat of criminal prosecution nor was the plaintiff able to show ___any___ actual prior enforcement of the challenged statutes, the mere fact that the plaintiff was altering his present and future conduct was sufficient to find the case ripe for adjudication.  Daien, in the same manner, is altering his planned future conduct because of a fear of criminal prosecution, a prosecution which is, based on this record, likely to occur if Daien violates the challenged statutes.

Recognizing the "chilling effect" on First Amendment rights as mentioned in *United for Bears* as a cognizable harm allows plaintiffs to make their showing for standing purposes without the necessity of identifying exactly which speech constitutes the harm.  The unique nature of the First Amendment predicate the policy reasons for this rule.  Facial challenges "are allowed not primarily for the benefit of the litigant, but for the benefit of society – to prevent the statute from chilling the First amendment rights."  *Secretary of State of Maryland v. Munson Co.*, 467 US 947, 958 (1984).  Facial challenges are permitted "when there is a lack of adequate procedural safeguards necessary to ensure against undue suppression of protected speech."  *Baby Tam & Co., Inc. v. City of Las Vegas*, 154 F.3d 1097, 1100 (9th Cir. 1998).  The Idaho statute chills and suppresses the free speech of Daien, and every other non-resident of Idaho, giving Daien standing to challenge the statute.  The suppression of Daien's right to free speech and association is the injury-in-fact and his claims are ripe.  *See California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003).  Therefore, Daien need only show that the regulations "affect [Daien] personally," *Burdick*, 937 F.2d at 418, and he can do that by showing he "self-censor[ed]" himself, *American*, 484 U.S. at 393.  Based on all of the foregoing, this case is ripe for adjudication and Daien has standing to prosecute this action.

**B.**   **Standard of Review.**

Summary judgment should be awarded where there is no material fact in dispute and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The question of whether a statute is facially unconstitutional is a pure question of law.  *See Village of Schaumberg v. Citizens for a Better Environment*, 444 U.S. 620, 634 (1980).  For that very reason, the Supreme Court has already directed that issues of the unconstitutionality of circulator restrictions and First Amendment violations should be decided on summary judgment.  *See id.* at 634-35.

Regarding the statutory constitutional analysis, binding Supreme Court and Ninth Circuit authority require the application of strict scrutiny.  The Ninth Circuit recently applied the *Anderson* case to an Arizona residency requirement for candidate petition circulators and found that strict scrutiny applies to the constitutional analysis.  *Nader*, 531 F.3d at 1034-35.  "The Supreme Court has held that when an election law is challenged, its validity depends on the severity of the burden it imposes on the exercise of constitutional rights and the strength of the state interests it serves."  *Id.* at 1034.  Furthermore,

> [I]n considering a constitutional challenge to an election law, a court must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" against "the precise interests put forward by the State as justifications for the burden imposed by its rule."

*Id.* at 1034 (quoting *Anderson*, 460 U.S. at 789).

Applying this standard to the residency requirement, the Ninth Circuit held that strict scrutiny applied.  "[T]he residency requirement nevertheless excludes from eligibility all persons who support the candidate but who . . . live outside the state of Arizona.  Such a restriction creates a severe burden on . . . [the candidate's] out-of-state supporters' speech, voting and associational rights."  *Nader*, 531 F.3d at 1036.  The Court then held that the severe burden

warranted strict scrutiny applied to the question of whether a residency requirement can survive a constitutional challenge.  Daien is just such an "out-of-state supporter" who lives outside of Idaho.  The statutory bar to Daien's contemplated circulation of nomination petitions is subject to strict scrutiny.  *See also Yes on Term Limits v. Savage*,  550 F.3d 1023, 1028 (10th Cir. 2008) (holding that petition circulation is "core political speech" and strict scrutiny applies to restrictions on "the available pool of circulators");  *Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 146 (2nd Cir. 2000) (holding that because the petition witnessing regulation restricts "core political speech" the "application of strict scrutiny clearly will be necessary").

Ysursa argues that strict scrutiny is not applicable for the review of Idaho's prohibition of non-resident circulators found in I.C. § 34-1807 by ignoring the fact that the statute restricts free speech.  Instead, Ysursa hopes to confuse the court and cast the issues as simply Idaho's oversight of elections.  Ysursa goes to great lengths in the hope of showing Idaho's regulation of elections is overall reasonable but never addresses the fact that prohibiting non-resident circulators is a severe restriction on core political speech.

The same strict scrutiny analysis applies to Daien's equal protection claim.[2]  The Supreme Court applied strict scrutiny striking down a 5% ballot-access signature requirement for a political subdivision of Illinois when the 5% requirement (in Cook County) demanded signatures in excess of the number of signatures required for general statewide ballot access.  *See Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979) (hereinafter

---

[2]  Daien's Complaint also challenged the requirement that only independent candidates must gather signatures for ballot access, as opposed to partisan candidates, which do not need to circulate ballot-access petitions.  The Supreme Court dealt squarely with this issue in *Jenness v. Fortson*, 403 U.S. 431 (1975) and Daien will not continue to press this claim.  It is worth noting that I.C. § 34-708A was originally passed in 1976, presumably in response to *Jenness*.  While the statute might survive the analysis set forth in *Jenness*, the statute does not survive *Socialist Workers Party*.

"*Socialist Workers Party*").  Independent Presidential candidates in Idaho find themselves in the same position as the non-partisan candidates in *Socialist Workers Party* found themselves.  A Presidential candidate in Idaho must obtain signatures totaling a particular percentage of the votes cast in the previous election, (I.C. § 34-708A – requiring 1%), and because that amount will exceed the number of signatures required for general statewide ballot access in regular statewide elections, strict scrutiny applies to this analysis.  *Compare* Doc. 29-5 and 29-6, Decl. of Daniel J. Treuden, ¶ 3, Ex. A (requiring 6,550 signatures for a Presidential candidate), *and* I.C. § 34-708(2)(a) (requiring 1,000 signatures for a state-wide candidate) (Facts, ¶¶ 6-7).  *See also Socialist Workers Party*, 440 U.S. at 183-85 (discussing strict scrutiny application).  Based on the foregoing, strict scrutiny applies to both of Daien's claims.

**C.**    **The Residency Requirement For Ballot-Access Petition Circulators For Presidential Candidates is Facially Unconstitutional.**

The constitutional analysis of Idaho statutes challenged by Daien are subject to strict scrutiny.  Ysursa was correct to anticipate Daien would rely on *Nader*, 531 F3d 1028, in this case.  Ysursa's attempt, however, to distinguish this case from *Nader* is unpersuasive.  Ysursa improperly contextualizes the holding of *Nader* by emphasizing immaterial factual distinctions between the *Nader* plaintiffs and Daien, and legal distinctions between the Arizona and Idaho statutory schemas governing elections.

**1.**    ***Idaho's Residency Requirement Imposes a Severe Burden on Daien's First Amendment Rights.***

The Ninth Circuit has unequivocally established that barring non-resident persons from circulating ballot access nomination petitions constitutes a severe burden on the non-residents' First Amendment rights to association and speech.  Ysursa's main brief attempted to blur the legal reasoning set forth in *Nader* by emphasizing the general rule of how courts determine when

a election regulation imposes a severe burden on a plaintiff and discounting the specific finding in *Nader* analyzing a residency requirement.

Ysursa improperly emphasizes the fact that Idaho's regulation is only a residency rule, and the Arizona statute at issue in *Nader* was a "qualified to register to vote" rule, which included a residency rule as a condition of person's eligibility to register to vote.  This would mean that *Nader* only struck down a "residency-plus" rule, not a "residency-only" rule.  Looking directly to *Nader*'s analysis of the Arizona statute, however, makes clear that residency was all that the Ninth Circuit cared about.  Furthermore, Ysursa discounts the fact that the Ninth Circuit was concerned with the non-residents' rights that are severely burdened by the regulation, not necessarily the candidates' rights (although the analysis would be the same for a candidate suffering harm by this statute).  Both of Ysursa's misconstructions are belayed by the following quote from *Nader*:

> While the district court correctly observed that there remain millions of potential Arizona circulators, the residency requirement nevertheless excludes from eligibility all persons who support the candidate but who, like Nader himself, live outside the state of Arizona.  **Such a restriction creates a severe burden on Nader and his out-of-state supporters' speech, voting and associational rights.**

*Nader*, 531 F.3d at 1036 (emphasis added).

In *Nader*, it was the residency requirement, not the "residency-plus" requirement, that was the central concern.  Indeed it was the severe reduction of potential petition circulators that "imposed a sever burden on rights of political expression."  *Id*. (citing *Buckley*, 525 U.S. at 194-95).  Here, Daien is a non-resident of Idaho, just as Nader was a non-resident of Arizona in *Nader*, and Daien's exclusion from petition circulation severely burdens Daien's "speech, voting and associational rights."  *Nader*, 531 F.3d at 1036.  *Nader* firmly establishes that residency

requirements impose severe burdens on the First Amendment rights of potential petition circulators, and based on *Buckley*, strict scrutiny applies.

> **2.      *Idaho's Residency Requirement Is Not Narrowly Tailored to Further a Compelling State Interest, as Nader Unequivocally Held in Striking Down the Arizona Residency Requirement.***

"Federal courts have generally looked with favor on requiring petition circulators to agree to submit to jurisdiction for purposes of subpoena enforcement, and the courts have viewed such a system to be more narrowly tailored means than residency requirement to achieve the same result."  *Nader,* 531 F.3d at 1037 (citing *Chandler*, 292 F.3d at 1242-44; *Krislov*, 226 F.3d at 866 n.7; and *Frami*, 225 F.Supp.2d at 970).  Ysursa made no argument why prohibiting non-resident circulators is more narrowly tailored for the State of Idaho than requiring non-residents to simply submit to jurisdiction.

Idaho limits the right to circulate Presidential petitions to those who are "a resident of the state of Idaho and at least eighteen (18) years of age."  I.C. § 34-1807.  The residency limitation on the right to circulate petitions infringes on core political speech and is not a narrowly tailored means to protect any compelling state interest and has been condemned by recent Ninth Circuit authority.  *See Nader*, 531 F.3d 1028.  Conditioning "core political speech" rights on state residency cannot be tolerated.  The Ninth Circuit held so in *Nader*, 531 F.3d 1028 when it struck down an Arizona statute's residency requirement identical to Idaho's residency requirement found in I.C. § 34-1807.  The Ninth Circuit extensively relied on *Buckley*, 525 U.S. 182, which was a case the Supreme Court found unconstitutional the restriction on the speech rights of potential petition circulators.  *Buckley* was, as Justice Rehnquist noted in his *Buckley* dissent, the invalidation of all such residency or registration-like restrictions on petition circulators.  "Today's opinion, however, calls into question the validity of *any* regulation of petition

circulation which runs afoul of the highly abstract and mechanical test of diminishing the pool of petition circulators or making a proposal less likely to appear on the ballot." *Buckley*, 525 U.S. at 228 (Rehnquist, C.J., *dissenting*) (emphasis in original).

Since *Buckley* was decided, the federal courts routinely and regularly struck down state law requirements that petition circulators could only circulate petitions to those in the same area where they could vote. *See e.g., Nader,* 531 F.3d 1028; *Nader v. Blackwell*, 545 F.3d 459, 476 (6th Cir. 2008); *Krislov v. Rednour*, 226 F.3d 851, 858-66 (7th Cir. 2000); *Frami v. Ponto*, 255 F.Supp.2d 962 (W.D. Wis. 2003); *Morrill v. Weaver*, 224 F.Supp 882, 904 (E.D. Penn. 2002) (Permanent injunction granted holding Pennsylvania residency requirement unconstitutional under *Buckley* and *Lerman*); *Chandler v. City of Arvada, Colorado*, 292 F.3d 1236 (10th Cir. 2002); *Lerman*, 232 F.3d at 145-54 (New York requirement that witnesses to ballot access designating petitions be resident of the political subdivision in which the office or position is to be voted for held unconstitutional); *Nader 2000 Primary Committee, Inc. v. Hechler*, 112 F.Supp.2d 575, 579 (S.D.W.V. 2000) (preliminary injunction granted where court found that "*Buckley* strongly suggests the West Virginia statute's resident registered voter requirement for petition circulators is presumptively unconstitutional"); *Nader 2000 Primary Committee, Inc. v. Hazeltine*, 110 F.Supp.2d 1201, 1205 (D.S.D. 2000) (South Dakota requirement that petition circulator be registered voters "became a nullity with the [*Buckley*] decision"); *Bernbeck v. Moore*, 126 F.3d 1114, 1117 (8th Cir. 1997) (pre-*Buckley* decision holding unconstitutional Nebraska law requiring petition circulators to be registered voters); *Lawrence v. Jones*, 18 P.3d 1245 (Ariz. App. 2001) (ruling that cities cannot limit circulator rights to city voters); 1999 Nev. Op. Atty. Gen. No. 37 (Dec. 1, 1999) (Nevada provisions requiring initiative petition circulators to be registered voters are unenforceable); 82 Ops. Cal. Atty. Gen. 250 (Dec. 22, 1999) (circulators of initiative petitions need not declare they are residents and voters).

*Nader* is of the most importance here being controlling Ninth Circuit authority.  After holding that *Buckley* compelled a finding that the residency requirement imposed a severe burden on the *Nader* plaintiffs' first amendment rights, the Ninth Circuit considered whether Arizona was protecting a compelling state interest in a narrowly tailored way which would allow the residency statutes to survive.  The Ninth Circuit found that it was not.

*Frami v. Ponto*, 255 F.Supp.3d 962 (W.D. Wis. 2003) is another case of particular interest here because the decision is a well-reasoned analysis of facts similar to this case's facts.  Relying on *Buckley*, and the Seventh Circuit case *Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000), District Judge Crabb struck down Wisconsin's residency requirement because it could not establish how the statute was narrowly tailored to protect a compelling state interest.  *Krislov* was a case involving whether ballot-access petition circulators must be a registered voter, and whether the circulators must be a registered to vote in the election district at issue in the petition.  *Id*. at 856.  Judge Crabb found that *Krislov*'s voter registration requirement was a *de facto* residency requirement, *Frami*,255 F.Supp.2d at 967, and effectively extended *Krislov*'s holding to the broader issue:  residency requirements.  The State of Wisconsin did not appeal this decision.

Judge Crabb's decision persuasively quoted *Krislov*:  "When the Government defends a regulation on speech as a means to . . . prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured."  *Krislov*, 226 F.3d at 865 (internal quotations omitted) (cited in *Frami*, 255 F.Supp.2d at 970).  Furthermore, the state must "show that the recited harms are real, not merely conjectural and that the regulation will in fact materially alleviate the anticipated harm."  *Frami*, 255 F.Supp.2d at 970 (internal quotations omitted).  All of Wisconsin's arguments failed to show how the residency requirement was narrowly tailored to protect a compelling state interest.

Similarly, too, all of Arizona's arguments in *Nader* failed to show the residency requirement was narrowly tailored.  "Federal courts have generally looked with favor on requiring petition circulators to agree to submit to jurisdiction for purposes of subpoena enforcement, and the courts have viewed such a system to be more narrowly tailored means than residency requirement to achieve the same result."  *Id*. (citing *Chandler*, 292 F.3d at 1242-44; *Krislov*, 226 F.3d at 866 n.7;  and *Frami*, 225 F.Supp.2d at 970).

Under strict scrutiny, the burden shifts to the defendant, to show that the residency restriction on speech and associational rights of circulators "is narrowly tailored to meet a compelling state interest, and that it seeks to protect its interest in a manner that is the least restrictive of protected speech."  *Am. Civil Liberties Union v. Reno,* 217 F.3d 162, 173 (2000) (3rd Cir. 2000) (vacated on other grounds).

In Ysursa's summary judgment motion, Ysursa makes minimal attempts to show that Idaho's prohibition on non-residents circulators is narrowly tailored or in the least restrictive manner to meet a compelling state interest.  Ysursa's arguments are similar to the arguments made by the State of Arizona in *Nader* – arguments rejected by the Ninth Circuit.  *See Nader,* 531 F.3d at 1037.

Ysursa argues, as did the State of Arizona, that prohibiting non-resident circulators helps prevent election fraud.  Ysursa gives examples of a recent petition fraud case in Idaho and several instances of petition circulators listing addresses of hotels.  He fails, however, to show that non-resident circulators commit more petition fraud than resident circulators.  For example, Ysursa makes no attempt to show that the defendant in the petition fraud case was a non-resident.  He also makes no attempt to show circulators listing a hotel address were non-residents or committed petition fraud.  Without showing that non-resident circulators commit more fraud, the State of Idaho has no compelling interest to prohibit non-residents circulators.  *See Krislov v.*

21

*Rednour*, 226 F.3d 851, 866 n. 7 (7th Cir. 2000) ("[I]f the use of non-citizens were shown to correlate with a high incidence of fraud, a State might have a compelling interest in further regulating non-citizen circulators.")[3]

Finally, and most importantly, Ysursa made no attempt to address its burden of showing that prohibiting non-resident circulators is the least restrictive means preventing petition fraud. Ysursa was quick to point out, as have several courts across the country, that preventing election fraud is a compelling state interest.  But the strict scrutiny analysis has two parts, not one. Ysursa must show that the regulation in question is narrowly tailored to further a compelling state interest.  The residency requirement cannot survive strict scrutiny, is unconstitutional on its face, and must be struck down as violating Daien's first amendment speech and associational rights.

**D.**	**The Signature Requirements for Presidential Ballot Access Are Greater Than Most Statewide Candidates, and is Unconstitutional, Especially When the State Has Less of an Interest in Presidential Elections Than Solely Idaho Statewide or Local Elections.**

Regarding the equal protection problem established by the requirement that an independent Presidential candidate get approximately 6.5 times as many signatures for ballot access as other statewide candidates, Ysursa paid little attention to this equal protection problem, concentrating primarily on whether the 1% rule is appropriate.  It was not until page 19 of Ysursa's memorandum that he argued the justification was based on different deadlines.  In the next presidential election cycle, statewide non-presidential independent candidates must submit

---

[3]  It bears noting that if Ralph Nader himself wanted to circulate his own ballot-access petitions in Idaho in support of his own independent candidacy, he could not do so.  He is a non-resident of Idaho.  But if Carol F. Johnson, the defendant in the election fraud case set forth in Ysursa's summary judgment motion, wanted to circulate some petitions, she could do so as long as she was a resident of Idaho, notwithstanding the fact that she was previously convicted of election law fraud.  (Doc. 28-5, Ex. H.)  This raises serious questions about the narrowly-tailored nature of the current regulation.

1,000 signatures by March 16, 2012.  Presidential independent candidates must submit 6,550

signatures by August 25, 2009.  The statute requiring only 1,000 ballot access signatures

constitutes the legislature's declaration about minimum quantum of statewide support necessary

to qualify for a candidate's ballot recognition.

Ysursa then states the obvious fact that a presidential independent candidate has an

additional five months to collect signatures without any explanation of how the minimum

quantum of statewide support needs to be 6.5 times as high in August as is required in March for

non-presidential independent candidates.  The goal of signature requirements is most logically to

avoid frivolous candidacies from cluttering the ballot.  *See Munro v. Socialist Workers Party*,

479 U.S. 189, 195 (1986) (discussing whether a state must make a particular showing of "actual

voter confusion, ballot overcrowding, or the presence of frivolous candidacies as a predicate to

the imposition of reasonable ballot access restrictions.")  Yet Ysursa fails to articulate why

submitting only 1,000 signatures for an independent U.S. Senator candidate is considered

evidence the candidate is not frivolous, but that somehow submitting 1,000 signatures on behalf

of an independent Presidential candidate is not sufficient to determine the candidacy non-

frivolous.  This does not even meet the rational basis test, much less the strict scrutiny test that

must be met as to this statute.

Ysursa also argues that the State of Idaho has a greater interest in the Office of President

because the President "lead[s] the entire country."  (Doc. 28-3, p. 19.)  This argument is belied

by the Supreme Court's finding in *Anderson* which held that a "State has a less important interest

in regulating Presidential elections than statewide or local elections because the outcome of the

former will be largely determined by voters beyond the State's boundaries."  *Anderson*, 460 U.S.

at 795.

This equal protection issue is controlled by *Socialist Workers Party*.  In *Socialist Workers Party*, the Supreme Court struck down an Illinois statute requiring signatures totaling 5% of the total number of persons that voted in the previous election to obtain ballot access.  In Cook County, there were over 700,000 persons that had voted in the previous election, which, in turn, required independent candidates to collect over 35,000 signatures in the subsequent election.  *Socialist Workers Party*, 440 U.S. at 183.  Another statute, however, allowed independent candidates to gain ballot access to a statewide office if they obtained 25,000 signatures.  *Id*. at 186.  The district court in *Socialist Workers Party* succinctly relied on an Eastern District of Arkansas decision as the basis to strike down the statute.  *Id*. at 179.

> On the merits of appellees' equal protection challenge, the [district] court found "[no] rational reason why a petition with identical signatures can satisfy the legitimate state interests for restricting ballot access in state elections, and yet fail to do the same in a lesser unit. . . .  Any greater requirement than 25,000 signatures cannot be said to be the least drastic means of accomplishing the state's goals, and must be found to unduly impinge [on] the constitutional rights of independents, new political parties, and their adherents."

*Id*. (quoting *Socialist Workers Party v. Chicago Bd. of Election Comm'rs*, 433 F.Supp. 11, 20 (N.D. Ill. 1977)).[4]

"The Illinois Legislature has determined that its interest in avoiding overloaded ballots in statewide elections is served by the 25,000-signature requirement.  Yet appellant has advanced no reason, much less a compelling one, why the State needs a more stringent requirement for Chicago."  *Socialist Workers Party*, 440 U.S. at 186.

Idaho finds itself with the same disparate situation here.  It is of no consequence that *Socialist Workers Party* was dealing with a geographic sub-division of Illinois and this case

---

[4]  It is interesting that this quotation suggest that the higher signature requirement cannot even be supported by "any rational reason" because, while a state must comply with strict scrutiny, they will be unable to survive even the rational basis test.

involves the same geographic district:  a statewide district.  The salient fact is that there are different ballot access requirements for different offices in the same election district.  Ysursa must still set forth a compelling reason, just like *Socialist Workers Party* required, for the higher signature requirement.  He will have to point to some unique fact regarding Presidential elections as compared to solely Idaho intra-state elections to justify the additional burden on Presidential ballot access, but that will be difficult given the fact that Idaho has a lesser interest in the Presidential election than it does in solely Idaho intra-state elections.  *Anderson*, 460 U.S. at 795.

Because there is no basis to conclude that a higher signature requirement for a Presidential independent candidate is appropriate when compared to other independent statewide candidates.  The higher signature requirement violates equal protection and summary judgment is appropriate in Daien's favor.

## **CONCLUSION**

Circulating petitions for a candidate for the Presidency is the core of political speech and the apex of First Amendment rights.  Limiting that right to only Idahoans when every other American has a right to exercise their core political speech in Idaho, cannot pass strict scrutiny or any scrutiny.

Similarly, requiring Presidential candidates to obtain about six times as many signatures than other statewide candidates to achieve a place on the election ballot violates the equal protection clause.  This requirement cannot pass a rational basis standard, much less strict scrutiny, given the fact that Idaho has less of an interest in Presidential elections than it does in solely Idaho statewide or local elections.

For all of these reasons, Daien prays for an order denying Ysursa's motion for summary judgment in all respects.

Respectfully submitted on this the 2nd day of October, 2009.

THE BERNHOFT LAW FIRM, S.C.
Attorneys for the Plaintiffs


  /s/ Daniel J. Treuden
Daniel J. Treuden, Esquire
*Pro Hac Vice* Counsel

207 East Buffalo Street, Suite 600
Milwaukee, Wisconsin 53202
(414) 276-3333  telephone
(414) 276-2822  facsimile
djtreuden@bernhoftlaw.com