# UNITED STATES DISTRICT COURT

# DISTRICT OF IDAHO

| | |
|---|---|
| DONALD N. DAIEN, | CV 09-22-S-REB |
| Plaintiff, | |
| vs. | **MEMORANDUM DECISION AND ORDER (AMENDED)** |
| BEN YSURSA, in his official capacity as Secretary of State of Idaho, | |
| Defendant. | |

The following Memorandum Decision and Order replaces the Court's Order dated April 19, 2010 (Docket No. 39).  The amendments are not substantive and the Court's analysis and conclusions are unchanged.

Currently before the Court are Defendant's Motion for Summary Judgment (Docket No. 28) and Plaintiff's Motion for Summary Judgment (Docket No. 29).  Both parties have consented to proceed before a United States Magistrate Judge.  (Docket No. 19).  The Court has carefully reviewed the record; considered the oral argument of counsel at the January 7, 2010 hearing; and now enters the following Order.

## I.  BACKGROUND

**A.    Factual and Procedural Background**

The facts are sparse, but undisputed and sufficient in their scope for the Court to enter judgment on the cross motions.  Plaintiff, Donald N. Daien, is an Arizona resident and past supporter of independent presidential candidate Ralph Nader, who wants to gather nominating petition signatures to secure ballot access for a yet unknown, independent presidential candidate,

**MEMORANDUM DECISION AND ORDER- 1**

"specifically Ralph Nader or other similarly-minded persons."  *Declaration of Donald Daien* ("Daien Declaration"), ¶¶ 3, 5 (Docket No. 29-3).  Defendant, Ben Ysursa, is a constitutional officer of the State of Idaho, elected to the position of Secretary of State of Idaho (hereinafter "Ysursa" or the "Secretary"), and is responsible thereby for enforcing Idaho's election laws. *Complaint*, ¶ 11 (Docket No. 1).

Daien challenges two Idaho statutes regulating ballot access for independent presidential candidates.  First, Daien argues that *Idaho Code* § 34-1807, which provides in part that only Idaho residents may circulate and verify signatures on a nominating petition, violates his First Amendment rights, because the requirement effectively prevents persons like him, who are non-residents, from circulating petitions in Idaho.  Second, Daien argues that Idaho Code § 34-708A, which requires that independent candidates for president must secure 6,550 signatures in order to be placed on the 2012 Idaho general election ballot, violates the equal protection clause of the United States Constitution, because independent candidates for statewide office only need obtain 1,000 signatures to gain a place on the same, statewide ballot, I.C. § 34-708(2).  Daien further argues that the disparate burden placed on independent presidential candidates, whomever such candidates might be, also violates his First Amendment rights.

**B.     Statutory Context**

Idaho law provides different paths for candidates to secure general election ballot access, depending upon whether a candidate has been nominated by a political party or is independent of party affiliation.  Candidates who file a declaration of candidacy through a political party must win that party's primary election in order to appear on the general election ballot.  *See* I.C. § 34-704.  In contrast, independent candidates must file a declaration of candidacy with a petition

**MEMORANDUM DECISION AND ORDER- 2**

containing a minimum specified number of signatures from qualified electors ("nominating petition"). *See* I.C. §§ 34-708, 34-708A.

The path to the Idaho ballot then branches again, in the different numbers of nominating signatures needed for independent candidates to obtain ballot access, depending upon the office sought. An independent candidate for a statewide office (the executive branch officers, such as the governor, lieutenant-governor, secretary of state and so on) must obtain 1,000 signatures, I.C. § 34-708(2). An independent candidate for president, in contrast, must obtain the signatures of at least one percent of the votes cast in Idaho for presidential electors at the previous general election in which a president was elected, I.C. § 34-708A. For the 2012 presidential election, that number of signatures is 6,550. *See Affidavit of the Hon. Ben Ysursa, Secretary of State of the State of Idaho* ("Ysursa Affidavit"), ¶ 3 (Docket No. 28-5).

The deadline for filing a nominating petition also varies, depending upon the office sought, with a later deadline for independent presidential candidates. Independent presidential candidates must file their declarations of candidacy with nominating petitions by August 25 before the general election in order to appear on the ballot. *Id.* In contrast, independent candidates for statewide office must declare their candidacy and submit their nominating petitions "on the tenth Friday preceding the primary election." I.C. § 34-704. In order to appear on the 2012 ballot, this deadline was March 16, 2012. *See Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment*, p. 16 (Docket No. 30).

Signatures on all nominating petitions must be verified in the manner prescribed by *Idaho Code* § 34-1807. *See* I.C. §§ 34-708(3), 34-708A. Section 34-1807 contains three requirements that qualify someone to circulate a nominating petition:

**MEMORANDUM DECISION AND ORDER- 3**

1.      The person circulating the petition must be a resident of the State of Idaho;

2.      The person circulating the petition must be at least 18 years old; and

3.      The person circulating the petition must verify, by affidavit, the following:

> "That I am a resident of the State of Idaho and at least eighteen (18) years of age: [sic] that every person who signed this sheet of the foregoing petition signed his or her name thereto in my presence: [sic] I believe that each has stated his or her name, post-office address and residence correctly, that each signer is a qualified elector of the State of Idaho, and a resident of the county of . . . ."

I.C. § 34-1807.

The statute then imposes a duty on the part of the county clerk, who must verify the signatures with a certificate addressed to the Idaho Secretary of State stating substantially the following: "I . . . hereby certify that . . . signatures on this petition are those of qualified electors." *Id.* The independent candidate then submits the verified nominating petition to the Idaho Secretary of State, I.C. § 34-705, in order to support a declaration of candidacy, I.C. § 34-708A.

Violations of these statutes carry severe consequences. For the potential candidate, a petition with signatures obtained "by a person not a resident of the state of Idaho and at least eighteen (18) years of age" is deemed void. I.C. § 34-1807. For the individual circulating the petition, a violation of the requirements of Section 1807, as with any violation of the election statutes, is a criminal act under Idaho law, carrying maximum penalties of up to two years in prison and a fine of up to $5,000. I.C. § 34-1822.

**MEMORANDUM DECISION AND ORDER- 4**

## II.  JURISDICTION

Secretary Ysursa contends that Daien's claims are not justiciable, because Daien lacks standing to bring suit and his claims are not ripe for review.  *Memorandum in Support of Defendant's Motion for Summary Judgment*, p. 2 (Docket No. 28-3).  Both standing and ripeness, *inter alia*, are key components of justiciability, a constitutional requirement for federal court jurisdiction.

Article III of the Constitution limits federal court jurisdiction to actual "cases" and "controversies."  *See U.S. Constn.* Art. III § 1; *see also Allen v. Wright*, 468 U.S. 737, 750 (1984); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009).  The "case or controversy" requirement "defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded."  *Allen v. Wright*, 468 U.S. at 750.  Both standing and ripeness are doctrines that stem directly from this constitutional requirement and involve "constitutional limitations on federal court jurisdiction and prudential limitations on its exercise."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *see also Alaska Right to Life Political Action Comm. v. Feldman* 504 F.3d 840, 848 (9th Cir. 2007).  These constitutional and prudential limitations reflect "concern about the proper--and properly limited--role of the courts in a democratic society."  *Warth*, 422 U.S. at 498.

### A.    Standing

Daien has the burden of demonstrating his standing.  *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1152 (9th Cir. 2000).  "As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on

**MEMORANDUM DECISION AND ORDER- 5**

his behalf." *Id.* at 498-99 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  The standing

doctrine prohibits the Court from determining the constitutionality of a statute "except as it is

called upon to adjudge the legal rights of litigants in actual controversies." *Baker v. Carr*, 369

U.S. at 204 (quotations and citations omitted).

      To satisfy Article III standing requirements, Daien must show (1) he has suffered an

injury in fact to a legally protected interest that is (a) concrete and particularized and (b) actual

or imminent (as opposed to conjectural or hypothetical); (2) the injury is fairly traceable to the

challenged statute; and (3) it is likely, as opposed to merely speculative, that the injury will be

redressed by a favorable decision.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC),

Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

(1992)).  Nonetheless, "the injury required for standing need not be actualized." *Davis v.

Federal Election Com'n*, 552 U.S. ----, 128 S.Ct. 2759, 2769 (2008).  *See also Steffel v.

Thompson*, 415 U.S. 452, 459 (1974) (holding plaintiff need not "first expose himself to actual

arrest or prosecution," in order to obtain relief).  Rather, a plaintiff may bring a suit based on a

prospective injury provided that the threat of enforcement is sufficiently "real, immediate, and

direct." *Davis v. Federal Election Com'n*, 552 U.S. at ----, 128 S.Ct. at 2769.

      In addition to these constitutional requirements for standing, the Court must also consider

the prudential components of standing:

> [P]rudential standing concerns require that we consider, for
> example, whether the alleged injury is more than a 'mere
> generalized grievance,' whether the plaintiff is asserting her own
> rights or the rights of third parties, and whether the claim 'falls
> within the zone of interests to be protected or regulated by the
> constitutional guarantee in question.'

*Alaska Right to Life*, 504 F.3d at 848-49 (citing *Johnson v. Stuart*, 702 F.2d 193, 196 (9th

**MEMORANDUM DECISION AND ORDER- 6**

Cir.1983).  However, generally "[p]rudential standing is satisfied unless [the party's] 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that [the legislature] intended to permit the suit.'" *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 861 (9th Cir. 2005) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)).

The Secretary argues that Daien lacks standing, because he cannot demonstrate that he has suffered an injury-in-fact.  *Memorandum in Support of Defendant's Motion for Summary Judgment*, pp. 4-5 (Docket No. 28-3).  According to the Secretary, Daien cannot meet this requirement, because neither Daien nor anyone else knows whether any independent candidates for President will attempt to qualify for the 2012 Idaho ballot.  *Id.*

"The difference between an abstract question and a 'case and controversy' is one of degree, of course, and is not discernible by any precise test." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297 (1979) ("*Farm Workers*").  "[W]hen plaintiffs seek to establish standing to challenge a law or regulation that is not presently being enforced against them, they must demonstrate 'a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.'" *LSO, Ltd.*, 205 F.3d at 1154 (quoting *Farm Workers*, 442 U.S. at 298).  This may be established by a variety of factors, including "the likelihood that the complainant will disobey the law, the certainty that such disobedience will take a particular form, any present injury occasioned by the threat of prosecution, and the likelihood that a prosecution will actually ensue." *Blanchette v. Connecticut Gen. Ins. Coprs.*, 419 U.S. 102, 143 n. 29 (1974).

**MEMORANDUM DECISION AND ORDER- 7**

As the Ninth Circuit has more recently described, "[i]t is sufficient for standing purposes that the plaintiff intends to engage in 'a course of conduct arguably affected with a constitutional interest' and that there is a credible threat that the challenged provision will be invoked against the plaintiff." *LSO, Ltd.*, 205 F.3d at 1154-55 (quoting *Farm Workers*, 442 U.S. at 298).  Other courts specifically examining a claimant's stated desire to engage in a course of conduct with a constitutional interest find standing where there is proof that the plaintiff: (1) has engaged in the type of speech affected by the challenged government action, (2) indicates a desire to engage in such speech in the future, and (3) has made a plausible claim that he will not do so because of a credible threat that the challenged regulation will be enforced.  *See Marijuana Policy Project v. Miller*, 578 F.Supp.2d 1290, 1301 (D. Nev. 2008); *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006) (en banc).

### 1.    Standing to Challenge *Idaho Code* § 34-1807

Here, the record supports a finding that Daien has standing to challenge the residency requirement set forth in *Idaho Code* § 34-1807.  First, Daien has actively supported independent presidential candidates in the past.  *See Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008)[1].  There is no evidence that his past support included gathering ballot-access signatures; however, there is evidence in the record reflecting Daien's involvement in legal challenges to perceived impediments to his political activities or the candidacies of his preferred candidate.  Thus, Daien has demonstrated more than a passing fancy about supporting independent presidential candidates, making his assertion that he intends to circulate petitions all the more plausible.

---

[1]  Daien was a co-plaintiff in this Ninth Circuit case arising out of the District of Arizona, dealing with Ralph Nader's efforts to appear on the 2004 Arizona general-election ballot as a presidential candidate.  In addition, Daien has filed the instant lawsuit demonstrating his support for independent presidential candidates, including Nader.

**MEMORANDUM DECISION AND ORDER- 8**

Second, Daien states a present desire "to circulate petitions for ballot access on behalf of Presidential candidates in the next Presidential cycle." *Daien Declaration*, ¶ 3 (Docket No. 29-3).  Daien resides in a western state, of relatively close proximity to Idaho, and there is nothing on the face of his claimed intentions in their full context that would seem to discredit his stated plans.

Third, Daien states that he "will not circulate ballot-access petitions under existing Idaho law," because it is illegal.  *Id.* at ¶¶ 4-5.  This threat of prosecution for violating *Idaho Code* § 34-1807 is not an empty concern, because Daien is an Arizona resident and would subject himself to criminal prosecution if he circulated petitions in Idaho.  *See* I.C. § 34-1822.  Further, Ysursa does not argue that Daien would not face criminal penalties as a non-resident circulating petitions, and there is evidence in the record that the State recently has prosecuted others for election fraud under *Idaho Code* § 34-1822. *See Affidavit of Counsel Michael Gilmore* ("Gilmore Affidavit"), ¶ 4, Ex. H (Docket Nos. 28-3, 28-4).

These facts are sufficient to establish that Idaho's residency requirement for petition circulators has a direct impact on Daien's ability to exercise the full reach of rights guaranteed him under the First Amendment.  But for the residency requirement, Daien could circulate a nominating petition in Idaho today and open the door both to a yet-undeclared candidate's campaign for president, as well as to political dialogue concerning the beliefs and strengths of his chosen candidate, regardless of whether that candidate in fact decides to declare a candidacy or ultimately pursues a campaign in Idaho.

The residency requirement directly limits Daien's First Amendment rights in two fundamental ways.  First, as an Arizona resident, Daien is limited in the nature of the support he

**MEMORANDUM DECISION AND ORDER- 9**

can offer to an independent candidate in declaring candidacy in Idaho.  Existing law completely precludes him from participating in the single most critical part of such a candidacy in Idaho-- that of obtaining sufficient nominating signatures to appear on the Idaho ballot.  This includes participation in any grass-roots effort to encourage an otherwise undeclared potential candidate to declare a candidacy by circulating nominating petitions on his or her behalf.[2]  Second, as an Arizona voter and supporter of independent presidential candidates, Daien has an interest in who qualifies for President in every state.  His preferred candidates-- independent presidential candidates-- are burdened in their attempts to gain ballot access in Idaho, because they are not permitted to enlist the assistance of non-Idaho residents to circulate petitions.  This, in turn, negatively impacts Plaintiff's support for such candidates.  Thus, Plaintiff has effectively demonstrated an injury-in-fact resulting from the residency requirement for petition circulators in Idaho.

Notwithstanding the Secretary's arguments to the contrary, standing does not depend on Daien identifying the specific independent presidential candidate he would like to support.  *See Burdick v. Takahushi*, 937 F.2d 415, 417-18 (9th Cir. 1991) (finding plaintiff had standing to challenge Hawaii's ban on write-in candidates though plaintiff could not name a candidate he would support if the ban was lifted).  It is self-evident that Daien's standing would be more firmly footed if he identified an independent candidate he presently intends to support and who had announced a candidacy before Daien filed the Complaint.  However, it is the residency

---

[2]  It is not unreasonable to consider a situation in which a groundswell of popular support in Idaho (as much as in any other state), as evidenced by signatures on a nominating petition, might encourage a candidate to declare a formal, nationwide campaign to run for president. Indeed, the very act of circulating a nominating petition–even if on behalf of an individual who has not yet declared or heretofore has no interest in a presidential candidacy–is at its core still among the most basic of the acts of protected speech.

**MEMORANDUM DECISION AND ORDER- 10**

requirement, not the candidate's declaration of candidacy, that is prohibiting Plaintiff from circulating petitions on behalf of an independent candidate.

Under Idaho law, an independent presidential candidate does not file a "declaration of candidacy" until the requisite number of signatures have been gathered.  *See* I.C. § 34-708A. Thus, the process of gathering signatures necessarily precedes a candidate's formal declaration of candidacy, and, if Daien were an Idaho resident, he could circulate a nominating petition today on behalf of the candidate of his choice.[3]

In addition, while Daien has not tied his claims to Ralph Nader exclusively, the record does contain some evidence indicating that Ralph Nader might run for President as an independent candidate in 2012.  *Gilmore Affidavit*, ¶ 2, Ex. F (Docket Nos. 28-3, 4).[4]  Similarly, the Secretary submitted other evidence indicating that there have been a number of independent candidates for president on the Idaho ballot*, see Ysursa Affidavit,* ¶ 9 (Ralph Nader in 2008), ¶ 12 (Lenora Fuloni, Bo Gritz, and Ross Perot in 1992).[5]  Hence, the record in this case reveals

---

[3]  There is no requirement in Idaho law that a particular independent presidential candidate announce his or her candidacy before collection of nominating signatures can begin. *Idaho Code* § 34-113 defines "candidate" as "every person for whom it is contemplated or desired that votes be cast at any political convention, primary, general or special election, and who either tacitly or expressly consents to be so considered, *except candidates for president and vice-president of the United States.*"  (Emphasis added.)  Hence, for independent presidential candidates, there is not even a threshold tacit or express "consent" requirement to a candidacy before signatures may be gathered.

[4]  This evidence comes from a news story dated November 5, 2008 quoting Ralph Nader's remarks to the National Press Club the day before.

[5]  In addition to these candidates and by way of limited example, the Court takes judicial notice that the following presidential candidates have appeared as write-in candidates in other Idaho elections: George Wallace (1968); John Anderson (1980); Ross Perot (1992 and 1996) and Ralph Nader (2000 and 2004).

**MEMORANDUM DECISION AND ORDER- 11**

that independent candidates for president are a frequent part of Idaho ballots in presidential elections; therefore, considering past as prologue, the Court can reasonably take notice for these purposes that, more likely than not, there will be independent presidential candidates in 2012.

Drawing upon that history, the Secretary contends--with an attractive but ultimately unavailing logic--that the fact of such independent candidates on prior Idaho ballots in recent presidential elections demonstrates that Idaho's requirements for ballot access do not present a constitutionally problematic barrier to such candidates.  The presence of independent candidates on prior ballots does illustrate that, at least for some candidates, the ballot requirements were not insurmountable.  However, the fact of such success for certain candidates does nothing to shed light upon the numbers of independent candidates who (regardless of the relative "strength" of their candidacies) may have sought to gain such access, but were stymied in their effort to cross the statutory Rubicon.

In sum, for standing purposes, it is sufficient that *but for* the residency requirement, Daien, a historic supporter of independent candidates, could circulate petitions and gather signatures in Idaho today for any candidate, or any person he might hope to persuade to take on such candidacy, regardless of whom eventually declares a candidacy.  This finding is consistent with Chief District Judge Winmill's decision in *Idaho Coalition United for Bears v. Cenarrusa*, 234 F.Supp.2d 1159 (2001) ("*Cenarussa*").  In *Cenarussa*, Judge Winmill found standing where the individual plaintiffs previously circulated ballot initiative petitions and indicated an intent to do so in the future.  Although the plaintiffs had no petitions circulating at the time of the lawsuit, they were well-known for their initiative work and had full control over whether they would engage in the initiative process.  Thus, their statements of future intent were neither hypothetical

**MEMORANDUM DECISION AND ORDER- 12**

nor speculative.  The Ninth Circuit affirmed the district court's ruling on the merits, although the standing issue was not addressed in the appeal decision.  *Idaho Coalition United for Bears v. Cenarrusa*, 342 F.3d 1073 (9th Cir. 2003).

Accordingly, Daien has alleged a sufficient constitutional injury to establish standing to challenge the constitutionality of *Idaho Code* § 34-1807.  This injury is the direct result of the residency requirement contained in *Idaho Code* § 34-1807, combined with the threat of criminal prosecution under *Idaho Code* § 34-1822.  Moreover, a favorable decision would allow Daien immediately to engage in circulating nominating petitions, regardless of who eventually does or does not announce an independent presidential campaign in Idaho.  This finding is not countered by prudential considerations.  Instead, the Court is persuaded that Daien has suffered an injury to a legally protected interest that is particularized and actual or imminent.  Further the Court is persuaded that the injury is fairly traceable to the challenged statute and it is likely that the injury will be redressed by a favorable decision.

### 2.    Standing to Challenge *Idaho Code* § 34-708A

As a presidential election voter and historic supporter of independent presidential candidates, Daien brings an equal protection challenge to *Idaho Code* § 34-708A.  Daien claims the different signature requirements for independent candidates for president compared to independent candidates seeking statewide office create an unlawful distinction that burdens his voting and associational rights.

The Secretary argues that Daien cannot bring this claim, because he is neither a candidate for office nor an Idaho resident.  *Memorandum in Support of Defendant's Motion for Summary Judgment*, p. 6 (Docket No. 28-3).  According to the Secretary, Daien's claim is a "generalized

**MEMORANDUM DECISION AND ORDER- 13**

grievance" on behalf of a third party, and the Court should decline jurisdiction on this basis. Certainly, at first blush, Daien's claim is this regard seems to be a remote and even obscure complaint for an Arizona resident to raise about Idaho ballot access requirements.

The concept of "standing" implicitly requires that the plaintiff have some personal stake in the outcome of the case, and a "distinct and palpable" injury by way of "specific, concrete facts." *Duke Power Co. v. Carolina Environmental Study Group, Inc*., 438 U.S. 59, 72 (1978). "As an aspect of justiciability, the standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth*, 422 U.S. at 498-99. "A federal court's jurisdiction . . . can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action . . ..'" *Id.* at 499 (quoting *Linda R.S. v. Richard D*., 410 U.S. 614, 617 (1973)).

Prudential limitations also guide the Court away from decisions upon "generalized grievances" and claims made on behalf of third parties. *Id.* "Without such limitations--closely related to Art. III concerns but essentially matters of judicial self-governance--the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Id.* at 500.

Even so, election laws by their nature affect the futures not just of candidates, but also the voters whose support they seek. "The rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have theoretical, correlative effect on voters." *Bullock v. Carter*, 405 U.S. 134, 143 (1972). The courts' "primary concern is with the tendency of ballot access restrictions 'to limit the field of candidates from which voters

**MEMORANDUM DECISION AND ORDER- 14**

choose.'" *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983) (quoting *Bullock*, 405 U.S. at 143).

Therefore, when considering restrictions upon candidates, courts must also "examine . . . the

extent and nature of their impact on voters." *Id.* "The impact of candidate eligibility

requirements on voters implicates basic constitutional rights." *Id.*

As an Arizona voter and supporter of third party candidates,  Daien contends that his

"associational rights and his own vote might be effectively diminished if Idaho's statute

unconstitutionally keeps candidates he supports off the ballot." *Plaintiff's Reply Memorandum*

*in Support of Plaintiff's Motion for Summary Judgment*, p. 3 (Docket No. 34).  In addition, as a

potential petition circulator, Daien contends that his "associational rights and his own voting

rights are violated by requiring Daien, and any associates working in concert with him, to obtain

a greater than necessary number of signatures for ballot-access than Constitutionally permitted."

*Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment*, p. 7

(Docket No. 32).

These voting and associational interests are sufficient to bring the equal protection claim.

The different signature requirements in Idaho require independent presidential candidates and

their supporters to gather significantly more signatures than independent candidates for statewide

offices.  Any signature requirement creates a burden, but this higher signature requirement creates

a much greater burden on independent presidential candidates who seek ballot access in Idaho

than on others who seek a ballot spot for statewide office, even though both elections involve a

statewide electorate.

Moreover, to the extent the independent presidential candidate is burdened in Idaho by the

need to devote additional resources to gather an extra measure of nominating signatures or face

the prospect of not securing a ballot spot, his or her chances of getting a message out more

**MEMORANDUM DECISION AND ORDER- 15**

broadly and succeeding in the national election are adversely affected.  This, in turn, affects those American voters in any state who would like to support the independent presidential candidate, no matter where such supporters are registered to vote.  Because Daien has an established record in support of independent presidential candidates and those candidates are affected by Idaho's ballot-access petition signature requirements, he has standing to bring this claim, as the disparate treatment of independent candidates in Idaho has a direct effect on his voting and associational rights.

**B.     Ripeness**

"The constitutional component of ripeness often overlaps with the injury-in-fact prong of article III standing."  *Alaska Right to Life*, 504 F.3d at 848, n.9 (citing *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003)).  However, "[r]ipeness is peculiarly a question of timing, designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1122 (9th Cir. 2009) (quotations and citations omitted).  "Our role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution."  *Id.*

The central issue to be resolved is "whether the harm asserted has matured sufficiently to warrant judicial intervention."  *Warth*, 422 U.S. at 499, n. 10.  "While 'pure legal questions that require little factual development are more likely to be ripe,' a party bringing a preenforcement challenge must nonetheless present a 'concrete factual situation ... to delineate the boundaries of what conduct the government may or may not regulate without running afoul' of the Constitution.  *Alaska Right to Life*, 504 F.3d at 849 (quoting *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1132 (9th Cir.1996)).

**MEMORANDUM DECISION AND ORDER- 16**

Here, there is no further factual record to be developed in order to determine the constitutional rights at stake and both claims are ripe for review.  If Daien were a resident of Idaho, he could begin circulating nominating petitions on behalf of an independent presidential candidate of his choosing before the candidate announced an intent to run in the 2012 election.  As discussed, *supra*, an independent candidate cannot file a "declaration of candidacy" in Idaho until the requisite number of signatures have been gathered and verified.  *See* I.C. § 34-708A.  Moreover, historically it has been a frequent practice for a candidate to announce his or her candidacy when the nominating petitions are filed.  Hence, although an "official" announcement may not come until the petitions are submitted for approval or filing, the work to accomplish the requirements for candidacy, including the gathering of requisite signatures, may have been ongoing for many months beforehand.

In addition, attempts by either litigants or the courts to "time" these ballot access cases is extremely difficult, because the election cycle is an ever-running stream.  By filing a claim prior to identifying a candidate of choice, Daien must answer the standing and ripeness challenges the Secretary of State raises here.  Yet, if Daien waits too long, he risks the possibility that his claims will be foreclosed due to the pendency of the election or rendered moot as a result of the election, even if he heads tantivy to the courthouse once the slate of candidates becomes clear.  *See Nader*, 531 F.3d 1028 (2008 decision regarding 2004 ballot access issue); *Schaefer v. Townsend*, 215 F.3d 1031, 1033 (9th Cir. 2000) (finding election challenge moot, because election had passed and candidate plaintiff had not demonstrated a likelihood of running for office again).

What makes Daien's challenge different here is that it does not depend on a specific candidate.  There is no candidate plaintiff.  Instead, Daien brings this challenge to a system that forecloses his participation and creates burdens for candidates he chooses to support who may as

**MEMORANDUM DECISION AND ORDER- 17**

yet be unannounced.  Therefore, the challenge transcends the candidate and the associated timing issues tied to a specific candidate.

Therefore, even though Daien has not identified a candidate he would like to support, his claims are ripe for adjudication.  *See Burdick*, 937 F.2d 415.  There are no additional facts to occur or be discovered in order to support his claims.

### III.  SUMMARY JUDGMENT STANDARD

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (*en banc*). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case.  *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor.  *Id*. at 256-57.  The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists.  *Celotex*, 477 U.S. at 324.

**MEMORANDUM DECISION AND ORDER- 18**

## IV.  CONSTITUTIONAL ANALYSIS

**A.    Level of Scrutiny Applied to Election Law Depends on Severity of Restriction**

The level of constitutional scrutiny applied to a state election law depends on the extent to which the law burdens constitutional rights.  "[T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights."  *Burdick v. Takushi,* 504 U.S. 428, 434 (1992).  When First Amendment rights "are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'"  *Id.* (citing *Norman v. Reed*, 502 U.S. 279, 289 (1992).  "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions."  *Id.* (citing *Anderson*, 460 U.S. at 787).

This standard implicitly recognizes that voting is a fundamental, constitutional right, yet states must, properly and by necessity, regulate the voting process.  *Burdick*, 504 U.S. at 433. This conflict between individual rights and state regulation of the electoral process is described as follows:

> Each provision of a code, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects-at least to some degree-the individual's right to vote and his right to associate with others for political ends. . . . Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . .  would tie the hands of States seeking to assure that elections are operated equitably and efficiently. . . . Accordingly, the mere fact that a State's system creates barriers tending to limit the field of candidates from which voters might choose does not of itself compel close scrutiny.

*Id.* (quotations and citations omitted).

**MEMORANDUM DECISION AND ORDER- 19**

Thus, even though voting is a recognized fundamental right, strict scrutiny applies only when an election law imposes a severe burden on First Amendment Rights.  In cases specifically addressing ballot access restrictions, courts look to the individual restrictions in light of the statutory scheme as a whole.  *See Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008).  "[T]he burden on plaintiffs' rights should be measured by whether, in light of the entire statutory scheme regulating ballot access, 'reasonably diligent' candidates can normally gain place on the ballot, or whether they will rarely succeed in doing so."  *Id.* (quoting *Libertarian Party of Washington v. Munro*, 31 F.3d 759, 763 (1994)).  Though not determinative, "past candidates' ability to secure a place on the ballot can inform the court's analysis."  *Id.*

Additionally, the States "have considerable leeway to protect the integrity and reliability" of election processes, provided that restrictions placed in the stream of the election process do not create "undue hindrances to political conversations and the exchange of ideas."  *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 191-192 (1999).

**B.      Strict Scrutiny Applies to the Residency Requirements of Idaho Code § 34-1807.**

The Ninth Circuit has considered the issues raised by Daien's challenge to the residency requirement on very similar facts presented in *Nader v. Brewer*, 531 F.3d 1028 (2008).  Even though each state election law must be analyzed on its own, the Ninth Circuit's analysis of Arizona's election statutes in *Nader* provides apposite authority for this Court to use when analyzing the specific challenges to Idaho's election system as it applies to independent presidential candidates.

In the *Nader* decision, the Ninth Circuit applied strict scrutiny to a residency requirement for petition circulators in Arizona, reasoning that the residency requirement created a severe burden on both the independent presidential candidate as well as his out-of-state supporters'

**MEMORANDUM DECISION AND ORDER- 20**

speech, voting and association rights, because it excludes them from participating in process of circulating nominating petitions. *Id.* at 1036. "[T]he residency requirement . . . excludes from eligibility all persons who support the candidate but who, like Nader himself, live outside the state of Arizona. Such a restriction creates a severe burden on Nader and his out-of-state supporters' speech, voting and associational rights." *Id.* (citing *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 186 (1999)).

The Secretary argues that the relevant facts in the *Nader* decision can be distinguished from the facts at issue here, because the statutory scheme regulating ballot access in Arizona was more burdensome than the current system in Idaho. *Memorandum in Support of Defendant's Motion for Summary Judgment*, p. 11 (Docket No. 28-3). First, Arizona required that petition circulators be qualified to vote in Arizona, the so-called "residency plus requirement." In contrast, Idaho requires that the petition circulators be Idaho residents, without requiring that they also be qualified to vote.[6] *Id.* pp. 12-13. Second, Arizona required a candidate to submit signatures equaling three percent of all registered voters, who are not registered with a political party recognized on the ballot. Idaho requires one percent of the total number of votes cast for presidential electors at the previous general election at which a president was elected. *Id.* Third, Arizona required candidates to submit the requisite signatures 90 days prior to the primary election (almost five months prior to the general election). Idaho requires that the signatures be submitted by August 25, which in 2012 will be 73 days prior to the general election. *Id.* Fourth,

---

[6] This distinction is slim at best. In Idaho, essentially the only individuals who can circulate petitions that are not otherwise qualified to vote are convicted felons and non-citizens. *See* I.C. § 34-104 (defining "qualified elector" as any person who is eighteen (18) years of age, is a United States citizen, and who has resided in the state and in the county at least thirty (30) days preceding the election); IDAHO CONST. art. VI, § 3 (disqualifying from otherwise qualified electors convicted felons who have not been restored rights of citizenship).

**MEMORANDUM DECISION AND ORDER- 21**

no independent candidate had appeared on the Arizona ballot since 1993.  The Idaho ballot has included several independent candidates, including Ralph Nader.  *Id.*  In light of these distinctions and the statutory scheme as a whole, Ysursa argues that Idaho's requirements for ballot access are minimal.

The Court must consider the statutory scheme as a whole and the Secretary accurately describes the Arizona statutory framework at issue in *Nader* as more restrictive in some particulars than in Idaho.  However, the Court nonetheless concludes that *Idaho Code* § 34-1807 severely burdens First Amendment rights and strict scrutiny must be applied.

As a preliminary matter, the aspect of the *Nader* decision holding that strict scrutiny applies to Arizona's residency requirement focuses exclusively on the residency requirement.  *See Nader*, 531 F.3d at 1036.  While the restrictions other than residency eliminate some small number of potential petition circulators, the circuit court was focused upon residency, presumably because this requirement had the greatest exclusionary effect on free speech--both in terms of the number of petition circulators excluded from the process of giving voice to their political beliefs and supporting the candidate of their choice, and the impact such an exclusion had upon the First Amendment rights of the people of Arizona.

As discussed in *Nader*, other courts looking at the residency requirement issue have focused on the "overall quantum of speech available to the election or voting process."  *See Chandler v. City of Arvada*, 292 F.3d 1236, 1238-39 (10th Cir. 2002); *Krislov v. Rednour*, 226 F.3d 851, 860 (7th Cir. 2000).  These cases focus upon the aspect of the United States Supreme Court's decision in *Buckley* holding that a Colorado petition circulation law imposed a severe burden on the speech rights of individuals involved with the initiative process, because it significantly decreased the pool of potential circulators, which in turn limited the size of the

**MEMORANDUM DECISION AND ORDER- 22**

audience that could hear the initiative proponents' message.  *See Buckley*, 525 U.S. at 193. Similarly focused on the ideas and messages excluded from the political conversation as a result of the residency requirement, this Court is convinced that the exclusion of out-of-state residents in the signature gathering process for independent presidential candidates creates severe burdens on First Amendment rights.

The Court has also considered the Secretary's rationale that even if restrictions and obstacles do exist in Idaho for independent presidential candidates, a sufficient number of candidates have made their way past them to gain access to the ballot to demonstrate that the obstacles are not too severe.  Ballot access is but one aspect of the First Amendment rights at issue here.  As a non-resident voter and supporter of independent presidential candidates, Daien's First Amendment rights include the rights to associate with others for political purposes, vote, and express political preferences.  *See Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) (restrictions on ballot access implicate the right to associate for political purposes, the right to vote, and the right to express political preferences).  And, as one of the most important structural values for our constitutionally-based society, the First Amendment provides all Americans, regardless of the state in which they live, access to the "unfettered interchange of ideas" *See Roth v. United States*, 354 U.S. 476, 484 (1957).

Moreover, while a lack of independent presidential candidates on the ballot may reflect that the process is breaking down and obstacles to ballot access are too high, the converse is not necessarily true.  The candidates who have succeeded in gaining ballot access may have succeeded against high odds.  There is no certain measure that can be drawn of how many candidates began unsuccessful efforts to place their names on the Idaho ballot, or were discouraged from even trying.

**MEMORANDUM DECISION AND ORDER- 23**

Regardless, the degree of limitation upon a candidate's ability to gain ballot access does not change the degree of restriction on Daien, as an out-of-state supporter who is barred from participating in the Idaho process of gathering signatures for independent candidates' nominating petitions.  Although non-residents may train and accompany residents in their signature-gathering efforts, the practical effect of the residency requirement is to exclude them from the signature gathering process.  The Court is persuaded, as Plaintiff contends, that there are a limited number of volunteers on campaigns and allowing any volunteer, regardless of residency, to circulate petitions increases the scope and exposure of the candidate's message.  *See Daien Declaration*, ¶ 6 (Docket No. 29-3).

Furthermore, preventing non-residents, like Daien, from circulating petitions on behalf of their chosen candidate not only creates severe restrictions on the non-residents' associational and voting rights, it also restricts the speech available to Idahoans, who benefit from the free exchange of ideas and political dialogue that comes from petition circulation.  As the Supreme Court stated in *Buckley*, "[p]etition circulation . . . is 'core political speech,' because it involves 'interactive communication concerning political change.'" *Buckley*, 525 U.S. at 186 (1999) (quoting *Meyer v. Grant*, 486 U.S. 414, 422 (1988)).

In short, the record sufficiently demonstrates that the residency requirement of *Idaho Code* § 34-1807, as applied to efforts to obtain signatures for independent presidential candidate nominating petitions, creates a severe restriction on free speech, thus requiring strict scrutiny. Without authority to carry petitions in the same manner as residents are permitted to do under Idaho law, non-residents are excluded from participating fully in the process of gathering signatures in Idaho in support of independent presidential candidates.  By barring these participants from the signature-gathering process, the residency requirement also limits the

**MEMORANDUM DECISION AND ORDER- 24**

quantum of speech available and impedes the free flow of ideas within the state of Idaho.  Thus, the Court must apply strict scrutiny when determining the constitutionality of *Idaho Code* § 34-1807.

This holding is also consistent with *Cenarussa*, 234 F.Supp.2d 1159.  Issued after *Buckley* but before *Nader*, the *Cenarussa* decision applied a reasonableness standard when conducting a constitutional review of the residency requirement for petition circulators in Idaho, because the plaintiffs did not set forth any evidence to demonstrate that the residency requirement created a "severe" burden on speech.  However, the plaintiffs in Cenarussa did not include any out-of-state voters and did not challenge the constitutionality of I.C. § 34-1807 in the context of a presidential nominating petition.  In contrast, Daien challenges the residency requirement of I.C. § 34-1807, which prohibits him, as an out-of-state resident, from gathering signatures and thus disseminating the ideas of an independent presidential candidate.  Consistent with the holding in *Nader*, this evidence provides a sufficient basis upon which this Court can determine that the residency restriction creates a severe restriction on First Amendment rights, as non-residents are left out of a critical part of the presidential campaign process and the over-all quantum of speech available is limited.

## C.    The Residency Requirement Fails a Strict Scrutiny Test.

In order to withstand this constitutional challenge, the Secretary of State must prove that the residency requirement of *Idaho Code* § 34-1807 is narrowly tailored to serve a compelling state interest.  *See Republican Party of Minnesota v. White*, 536 U.S. 765, 774-75 (2002); *California Pro-Life Council, Inc. v. Rudolph*, 507 F.3d 1172, 1178 (9th Cir. 2007).  Here, the Secretary argues that the residency requirement furthers two state interests: (1) it preserves the integrity of the ballot and protects against fraud and (2) ensures that there is a modicum of local support for the candidate.

**MEMORANDUM DECISION AND ORDER- 25**

Protecting against election fraud is a compelling state interest.  *Nader*, 531 F.3d at 1037.

"A State indisputably has a compelling interest in preserving the integrity of its electoral

process."  *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231 (1989).

As further described by our highest court:

> Confidence in the integrity of our electoral processes is essential to
> the functioning of our participatory democracy. Voter fraud drives
> honest citizens out of the democratic process and breeds distrust of
> our government. Voters who fear their legitimate votes will be
> outweighed by fraudulent ones will feel disenfranchised. '[T]he
> right of suffrage can be denied by a debasement or dilution of the
> weight of a citizen's vote just as effectively as by wholly
> prohibiting the free exercise of the franchise.'

*Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)).

Similarly, the State has a compelling state interest in managing its elections and ensuring

that the ballot is orderly and comprehensible to the voters.  *See Anderson v. Celebrezze*, 460 U.S.

at 780, n. 9.  "The State has the undoubted right to require candidates to make a preliminary

showing of substantial support in order to qualify for a place on the ballot, because it is both

wasteful and confusing to encumber the ballot with the names of frivolous candidates."  *Id.*

Hence, as part of regulating the election process, the State properly can exercise some degree of

sifting and sorting of potential candidates, so as not to weigh down a ballot with the confusion

and handling difficulties of inordinately long ballots, full of candidates without even a modicum

of credibility to their campaigns.

During the hearing upon this matter, counsel for the Secretary argued that Idaho's

residency requirement for petition circulators, coupled with the signature requirement for ballot

access, ensures a level of local support for a particular candidate before allowing ballot access.

The premise of his argument is that a candidate who cannot recruit residents to circulate petitions

**MEMORANDUM DECISION AND ORDER- 26**

in Idaho is a candidate lacking local support and therefore should not be allowed to clutter the Idaho ballot.   Therefore, the residency requirement helps ensure that only independent presidential candidates who have gained some national credibility may access the Idaho ballot, presumably because the fact of support elsewhere in the country would be a reason for Idaho citizens to consider supporting the candidate, and that if such support is lacking, then there is no need to clutter the Idaho ballot with such candidates.

Such a perspective is certainly consistent with the manner in which presidential elections historically have been conducted in regard to Idaho in the last half century or longer, which is to say, with seldom a glance in Idaho's direction.  The small populace, only four electoral votes and the fact of a significantly predominant major party in Idaho politics for many decades running has kept presidential candidates winging high in the skies above Idaho on their way elsewhere, only rarely and surprisingly touching down to campaign within Idaho's borders.  Idaho voters, therefore, are used to the idea that presidential candidates come from someplace else, and that support for such candidates must have gained traction elsewhere before Idahoans are even likely to be aware of their actual or potential candidacies.

However, the historical fact of such political patterns is not a proper justification to suggest that there is no cognizable injury suffered by Daien here, or that the residency requirement impediment to a potential candidate is consistent with an overall, constitutionally-appropriate regulation of the voting process.  In the national marketplace of ideas and political advocacy, there is no lesser currency to an idea or issue or candidate that originates or gains strength in Idaho than from any other state in the country.  Who is to say that some future independent political movement may not as likely germinate or gain its momentum in Idaho as in any other state, particularly if one of the hallmarks of an independent political campaign is a

**MEMORANDUM DECISION AND ORDER- 27**

connection with voters who may otherwise feel disaffected from the major political parties and their candidates, in a setting where such voters may already feel overlooked and underappreciated in part because of their arguably less significant political influence compared to more populous states?  Similarly, what should prevent some person from outside Idaho's borders, of whatever close or far connection to the State, from acting upon a recognition of the potential in Idaho for a wellspring of new political thought, or the nativity of a successful independent presidential candidate?  A ballot process that generally presumes by its nature that new ideas and new candidates are always imported and that additionally discourages non-residents from working within Idaho to press debate upon and foster support for new ideas and new candidates, is inherently nefarious and certainly inimical to First Amendment principles.

The Court has also considered the Secretary's argument that the residency requirement is necessary in order for the Secretary of State to subpoena and to reach petition circulators for questioning about the signatures on the ballot.  This argument reflects a legitimate concern for the integrity of the election process.  Nonetheless, the purported protection found in the challenged statute is much too inexact a fit to meet requirements of strict scrutiny.  In Idaho, petition circulators are required to verify, *on belief*, the most important of the *bona fides* of the nominating petition–*i.e.*, that the signators are qualified electors (see I.C. § 34-1807).  However, the petition circulators have no means of verifying such information at the time that the signatures are received.  Hence, Idaho law requires that the petitions be independently verified by the county clerk, the public official who is able to verify whether the persons whose names appears on the petition are qualified electors.  Although there may be some ministerial value to the requirement that the person circulating the petition make some inquiry or act of due diligence concerning the qualified elector status of the person signing the petition, such a responsibility could be removed

**MEMORANDUM DECISION AND ORDER- 28**

from the petition circulator entirely and left to the role of the county clerk, who has the information available to verify the status of the persons signing the petition.  In doing so, the otherwise entirely legitimate concern of the State to protect against election fraud would still be fully met.

In addition, there is no evidence in the record nor is there any common sense argument that Idaho residents are less likely to commit voter fraud than out-of-state residents.  Similarly, even if there were some reliable evidence that non-resident petition circulators are more likely to be election fraud scofflaws than a resident of Idaho, there is no evidence in the record to suggest that out-of-state residents are any more difficult to run to the ground than Idaho residents who might be engaged in such fraud.

Thus, the only compelling state interest the residency requirement is designed to effectuate is the necessity of bringing petition circulators before the Secretary of State, if there is a question about the signatures on a particular petition, in order to determine whether the signatures on the petitions are genuine and to be able to enforce the law against out-of-state residents who have committed voter fraud.  There is an alternative and less restrictive means of achieving these ends, by which the Legislature could require petition circulators to subject themselves to the subpoena power of Idaho courts, the so-called "consent to jurisdiction alternative."  *See Nader*, 531 F.3d at 1037.

Moreover, as for ensuring a reasonable measure of local support and legitimacy to the candidacy, that is what the signature requirements accomplish.  It is not necessary to add an additional residency requirement on the petition circulator to ensure local support.

Because the residency requirement is not the least restrictive means of ensuring the state's compelling interest in guarding against voter fraud and is not necessary to ensure local support,

**MEMORANDUM DECISION AND ORDER- 29**

the residency requirement set forth in I.C. § 34-1807 cannot meet a strict scrutiny test. Accordingly, the statute's residency requirement is unconstitutional as applied to nominating petitions for independent presidential candidates.

**D.     The Distinct Signature Requirements Must Meet a Rational Basis Standard.**

In order to appear on the ballot in Idaho, an independent presidential candidate must obtain signatures in an amount totaling at least one percent of the total votes cast in the previous presidential election. This creates a requirement of 6,550 signatures for an independent presidential candidate to gain access to the 2012 Idaho ballot.[7]  *See Idaho Code* § 34-708A. In contrast, independent candidates for statewide elections only need 1,000 signatures. *See Idaho Code* § 34-708(2)(a). Daien argues that this distinction violates the equal protection clause of the Fourteenth Amendment.

The Fourteenth Amendment's equal protection clause "'announces a fundamental principle: the State must govern impartially. General rules that apply evenhandedly to all persons within the jurisdiction unquestionably comply with this principle.'" *Jones v. Helms*, 452 U.S. 412, 423 (1981) (quoting *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 587 (1979)). Unless a classification violates fundamental personal rights or implicates a suspect classification, the law is constitutional provided that it bears a rational relation to a legitimate state interest. *Lockary v. Kayfez*, 917 F.2d 1150, 1155 (9th Cir. 1990) (citing *City of New Orleans v. Dukes*, 427 U.S. 297, 303-04 (1976)).

Daien does not allege a denial of equal protection based on membership in a suspect class. Rather, he alleges that the law impermissibly distinguishes between independent candidates for national versus statewide races. Even so, and while voting is a fundamental right, case law makes

---

[7] It is undisputed that 1% of the voters in the last presidential election is 6,550. *See Declaration of Daniel J. Treuden*, ¶ 3 (Docket No. 29-4).

**MEMORANDUM DECISION AND ORDER- 30**

clear that strict scrutiny should not be applied unless the restriction poses a "severe" burden on constitutional rights.  With regard to the signature requirement, Daien has not met this burden.

In contrast to the residency requirement, the signature requirement does not operate as a direct bar on Daien's constitutional rights to free expression and consequently does not have a substantial effect on the quantum of speech available.  Instead, the signature requirement creates a burden on independent candidates' ability to obtain ballot access in Idaho.  While this has a derivative and legally cognizable effect on voters, the nature of the restriction is distinct from and not as severe as the residency requirement.  Moreover, the right of a candidate to appear on the ballot is not fundamental and "the existence of barriers to a candidate's access to the ballot 'does not itself compel strict scrutiny.'"  *Clements v. Fashing*, 457 U.S. 957, 963 (1982) (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)); *see also Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986).

Without evidence of a severe burden or suspect class, the Court examines the distinction under a rational basis standard.  *See McQueary v. Blodgett*, 924 F.2d 829, 834 n. 6 (1991).  Accordingly, the statute meets constitutional standards where the legislature's action bears some rational relation to a legitimate state interest.  *Jackson Water Works, Inc. v. Public Utilities Comm'n of State of Cal.*, 793 F.2d 1090, 1094 (1986).

**E.    The Distinct Signature Requirements Fail the Rational Basis Standard.**

As the Secretary argues, a signature requirement is a reasonable way to ensure that a candidate has some modicum of support for ballot access.  There is "an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot. . . ."  *See Jenness v. Fortson*, 403 U.S. 431, 442 (1971).  Requiring some preliminary showing of public support for ballot access helps to

**MEMORANDUM DECISION AND ORDER- 31**

ensure an orderly ballot and to avoid "confusion, deception, and even frustration of the democratic process at the general election."  *Id.*

However, Idaho has distinct requirements for independent candidates for different offices. *See* I.C. §§ 34-708, 708A.  An independent candidate for statewide office must gather a flat 1,000 signatures, an amount that does not change from one statewide election cycle to the next.  On the other hand, an independent candidate for president must gather one percent of the votes cast in the most recent presidential ballot (for the 2012 presidential election, that number will be 6,550). Hence, the independent candidate is treated differently in two respects: first, his or her minimum signature requirement changes every four years; second, the required number will be a number that will continued to become greater and greater than that required of the independent statewide candidate, as the State continues to grow and as more people vote in the presidential election.

The Court can discern no rational basis for treating these classes of candidates distinctly. All registered voters in Idaho may vote in the statewide and presidential elections.  Thus, the quantum of support necessary to ensure an orderly ballot for one office ought to be sufficient for the other.  *See Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979). The same number of potential voters are involved in the selection of these candidates, regardless of the state or federal character of the office.[8]

---

[8]  The Court is mindful that that the total number of voters changes in each election, and that not all voters cast votes in each and every race within the same election.  Hence, the total number of voters who cast a vote in the governor's race, or the election for the secretary of state, or the election for U.S. Representative or U.S. Senator, may well be different not from each race to the other, but also from the number of votes cast on the presidential ballot.  However, Idaho sets the same flat ballot qualification number for each of the statewide elective offices, regardless of how many votes was cast in each of those races in the prior statewide election, but then sets a percentage requirement for the independent presidential candidates, a number that will change every four years depending upon the total votes cast for president.

**MEMORANDUM DECISION AND ORDER- 32**

The Secretary makes two arguments to justify the distinct treatment of these candidates. First, the Secretary argues that the required modicum of support should be greater in proportion to the significance and influence of the office.  However, the stated purpose for the signature requirement is to ensure some modicum of local support and, thus, ensure a more orderly ballot. Because the number of voters eligible to vote in the statewide versus presidential elections is the same, this rationale makes little sense and is misplaced justification.

Second, the Secretary contends that the different independent candidates have different deadlines for submitting their signatures, thus justifying the distinct treatment.  For example, in the 2012 presidential election year, independent candidates for statewide office must submit 1,000 signatures by March 16, 2012 to gain the ballot.  In contrast, independent candidates for president must submit 6,550 signatures by August 25, 2012.  Certainly, allowing the presidential candidates more time helps lessen the burden of the higher signature requirement.  Nonetheless, the later deadline does not, by itself, justify a higher signature requirement, particularly a signature requirement (for 2012) that is more than six times greater than that imposed upon the statewide independent candidate.

The difficulty in justifying the one percent measure is a direct reflection of its arbitrary nature.  It is hypothetically possible, though unlikely, that the one percent requirement could result in a number less than the 1,000 signatures required for statewide offices.  The statutory system results in a signature requirement for independent presidential candidates that changes every four years, while the required number of signatures for independent statewide candidates is static.  Even allowing for the imperfect fit that sometimes still meets a rational basis test, the disparity of Idaho's different requirements for independent statewide candidates compared to

**MEMORANDUM DECISION AND ORDER- 33**

independent presidential candidates simply is no fit at all.[9]  The considerably different number of nominating signatures required of independent presidential candidates, compared to independent statewide candidates, has no rational connection to the protection and reliability of the Idaho election process.  It does, however, create an unnecessary and therefore "undue hindrance[ ] to political conversations and the exchange of ideas."  *Buckley*, 525 U.S. 182, 192 (1999).

In light of the above, the distinct treatment of independent candidates for statewide versus presidential office cannot meet even a rational basis test.  Accordingly, the signature requirements set forth in *Idaho Code* § 34-708A are unconstitutional.

## V.  ORDER

In accordance with the foregoing, IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment (Docket No. 29) is GRANTED to the extent that the Court finds the following provisions of Idaho statutes unconstitutional: (1) the residency requirement for petition circulators in *Idaho Code* § 34-1807, as applied to nominating petitions for independent presidential candidates; and (2) the one-percent signature requirement in *Idaho Code* § 34-708A that requires independent candidates for presidency submit a nominating petition with signatures from a number of qualified electors not less than one percent of the number of votes cast in Idaho for presidential electors at the previous general election at which a president of the United States was elected.

---

[9]    That is not to say, however, that the Court holds that the total number of signatures required for an independent presidential candidate violates the equal protection clause, but rather that the statute's different treatment of the independent presidential candidate from the independent statewide candidate, on these facts, is constitutionally infirm.  The Court makes no ruling upon whether the total number of nominating signatures required of the independent presidential candidate would violate constitutional standards *if* the independent statewide candidates were also required to gather that same number.

**MEMORANDUM DECISION AND ORDER- 34**

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment (Docket No. 28) is DENIED.



DATED:  **May 5, 2010**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER- 35**